[Civ. No. 39377. First Dist., Div. One. Aug. 31, 1977.]

CITY OF WALNUT CREEK, Plaintiff,
Cross-defendant and Respondent, v.
LEADERSHIP HOUSING SYSTEMS, INC.,
Defendant, Cross-complainant and Appellant.

612

**COUNSEL**

Campbell, Van Voorhis & Bybee and Kenneth J. Branch for Defendant, Cross-complainant and Appellant.

Daniel J. Curtin, Jr., City Attorney, Rinehart & Schwartz and Gary Rinehart for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**SIMS, Acting P. J.**—Defendant and cross-complainant Leadership Housing Systems, Inc., a land developer, which from January 28 to November 1, 1974, held an option on property the subject of a condemnation action subsequently instituted on February 11, 1975, by the City of Walnut Creek, has appealed from a judgment in that action which respectively found that it had no right, title or interest in the property condemned and denied it the compensation sought in its answer, and also denied it any relief on its cross-complaint, in which it sought damages for inverse condemnation on account of actions taken by the city and its authorized agencies and agents between June of 1974 and October 14, 1974.

The uncontradicted evidence reflects that Leadership on November 1, 1974, surrendered its option rights to the optionor who owned the property. It is therefore in no position to attack the judgment on the

city's complaint, which found it had no interest in the property on February 11, 1975. It does contend that the acts taken by the city during the period the option was contractually viable constituted a de facto taking of these rights for which it should be compensated. There is no merit to that claim. The record shows that Leadership took its option with notice that the property might ultimately be condemned, that the option expired because the conditions under which Leadership hoped to develop the property did not ensue, and because it failed to pay the sums necessary to extend it, and that there was no act or omission by the city or its engineers or agents which was not in accord with legitimate zoning and planning procedures. The judgment must be affirmed.

The pertinent facts in this case, which are set out below, are undisputed by the parties and taken primarily from the trial court's findings of fact.

On January 28, 1974, Leadership entered into a real estate purchase contract with Cortese Land Company for the acquisition of approximately 134 acres of property located in Walnut Creek. This property was zoned as a Hillside Planned Development (HPD) pursuant to the Walnut Creek Municipal Code sections 10-2.1301 through 10-2.1307. Under the applicable local density standards, a maximum of 222 dwelling units could be constructed within the subject property.

Leadership's obligation to effect purchase from Cortese under the real estate purchase contract was contingent upon governmental approval of the construction of a minimum of 139 units upon economically feasible conditions by December 1, 1974. Leadership had a contractual right to extend the purchase from December 1, 1974 to April 1, 1975 upon payment of sums specified in such contract to Cortese.

The city proposed to acquire the subject property conditioned upon the approval by the electorate of a bond issue election which was scheduled for June 1974.

Prior to entering into the real estate purchase contract in January 1974, Leadership was informed of the possibility that the subject property would be acquired for public use. The contract indicated Leadership's knowledge of such possibility.

Lee Babbitt, an executive with Leadership Housing Systems, Inc. was in charge of the potential development of the subject property. In

February 1974, Mr. Babbitt met with Karel Swanson, community development director of the City of Walnut Creek, and Edwin Peabody, secretary of the planning commission of the City of Walnut Creek, regarding the requirements to obtain a HPD permit for the subject property. In the course of such meeting, Mr. Babbitt was informed that the city was contemplating the acquisition of the subject property for open space purposes. Despite Leadership's knowledge of the city's possible acquisition, Leadership went forward with its planning because it felt the June bond issue providing funds for such acquisition would not be passed by the voters and Leadership would, in its development, dedicate some 100 acres to the city and confine its development to 34 acres located in the northeast portion of the Cortese property indicated as appropriate for development in the 1973 open space report to the City of Walnut Creek.

On March 4, 1974, Mr. Babbitt attended a meeting of the Walnut Creek City Council and obtained a bulletin describing the open space plan and that a campaign committee was working to promote a bond election to that end in June 1974.

On March 20, 1974, Mr. Babbitt filed on behalf of Leadership Homes an application for a HPD permit for the subject property with the City of Walnut Creek and paid the permit application fee therefor. Upon review of permit application, Mr. Babbitt was advised by Mr. Edwin Peabody that an earlier environmental impact report for the subject property could not be revised by means of an addendum thereto but a completely new environmental impact report would be required.

On March 21, 1974, Leadership Homes paid the environmental impact report preparation fee to the City of Walnut Creek to begin the preparation of the draft environmental impact report by the City of Walnut Creek.

On May 24, 1974, a draft environmental impact report was completed with notice given to respond thereto by July 4, 1974.

On June 5, 1974, bond issue authorizing $6,750,000 bond to acquire open space was approved by more than two-thirds of voters of Walnut Creek.

On June 6, 1974, secretary to Walnut Creek Planning Commission, Edwin Peabody, by letter advised Leadership that a meeting scheduled for June 13, 1974, between Leadership and various members of the staff of the Walnut Creek Planning Commission to consider the draft environmental impact report and the HPD permit application was cancelled. The reason given was that the subject property was one of the properties to be purchased for open space as a result of the passage of the open space bond issue.[1]

On objection by Mr. Babbitt on June 8, 1974, the City of Walnut Creek rescheduled the planning staff meeting with Leadership on the subject property to June 20, 1974.

Planning commission staff meeting with Leadership held on June 20, 1974, regarding HPD permit application and the draft environmental impact report concerning the subject property.

On August 13, 1974, meeting with Walnut Creek planning committee design review committee was held on the subject property.

On August 21, 1974, Leadership application for HPD permit was denied by Walnut Creek design review committee on grounds of traffic grading and location of the development's recreation center.

On September 10, 1974, Walnut Creek planning commission denied Leadership's HPD application after hearing.[2]

---

[1]The letter provides:
"NOTICE<br>
CANCELLATION OF STAFF CONFERENCE<br>
H-P-D PERMIT APPLICATION NO. H-5 - RUDGEAR MEADOWS
"The staff conference scheduled for 10:00 a.m., Thursday, June 13, 1974, in the Conference Room of the Community Development Department, 1501 N. California Boulevard, Walnut Creek has been cancelled.

"The subject 139-acre parcel located generally to the west of the Livorna Estates development and south of Youngs Valley Road is one of the properties which will be purchased for Open Space as a result of the passage of the bond issue on Tuesday, June 5, 1974."

[2]The minutes of the September 10, 1974, meeting, which are also quoted by the city, provide in part that: "Upon deliberation by the Commission, motion by Mr. Armstrong that the Planning Commission adopt a resolution (No. 1570) denying H-P-D Permit Application No. H-5 for the reasons that it would not comply with the Health, Safety, and Welfare requirements of Municipal Code Section 10-2.2210(d)(1); would not meet requirements of Municipal Code Section 10-2.1301; and would not be consistent with the

On September 20, 1974, Leadership appealed HPD permit denial to the Walnut Creek City Council.

On October 14, 1974, the Walnut Creek City Council heard Leadership's appeal of planning commission's denial of HPD permit, and affirmed the denial of permit by the planning committee.[3]

Open Space Element and its Action Program of the General Plan. Second by Mr. Hartman."

Resolution 1570, which was adopted at the September 10, 1974 meeting, is as follows:
"WALNUT CREEK PLANNING COMMISSION
Resolution No. 1570
H-P-D Application No. H-5

"WHEREAS the Walnut Creek Planning Commission on September 10, 1974, held a public hearing pursuant to H-P-D Permit Application No. H-5, filed March 20, 1974, by George S. Nolte and Associates, Engineers, in behalf of Leadership Homes, in which it was requested that a permit be approved for a residential development, the filed plan indicating 139 dwelling units on the 139-acre parcels of land generally bounded by Interstate 680, the southerly lines of Sans Crainte Unit No. 4, Subdivision No. 2800, Sans Crainte Unit No. 3, Subdivision No. 3762, and Subdivision No. 3972; and

"WHEREAS development pursuant to the plan would provide the public with more than 100 acres of open space, but the general layout and street width does not provide adequate access thereto; and

"WHEREAS all existing roads which provide access to the subject property are inadequate for the additional traffic which would be generated by the requested development; and

"WHEREAS development of the subject property would be contrary to the open space element of the General Plan; and

"WHEREAS the preliminary grading plan appears to indicate that grading in excess of that permitted by the H-P-D zone would be necessary; and

"WHEREAS the site plan indicates instances where grading would be closer to the main ridge line than intended by the H-P-D zone; and

"WHEREAS some residential structures appear to be located too close to the recreational facilities for optimum living conditions.

"NOW THEREFORE BE IT RESOLVED that the Walnut Creek Planning Commission finds as follows:

"1. The qualified electorate of Service Area R-8, on June 4, 1974, approved a bond sale constituting the basic and primary implementation measure of the Walnut Creek 'Parks, Trails, Conservation, and Open Space General Plan Element.'

"2. The property the subject of this H-5 permit application has been designated as having open space values located within the County Service Area R-8 boundaries and therefore is subject to acquisition as park land under the City's 'Parks, Trails, Conservation, and Open Space General Plan Element.'

"3. That approval of the H-5 application would not be in the best interests of the public health, safety, and general welfare.

"Based on the foregoing findings, the Planning Commission hereby denies H-P-D Permit Application No. H-5."

[3]Pertinent segments from the minutes of the October 14, 1976, meeting, which are also quoted by the city, are set out below: "The Council had considerable discussion and expressed concern over the extensive grading and the inadequate access to the proposed open space, the increased traffic on roads not adequate to carry the additional traffic, and the potential slide hazard areas, as mentioned in the departmental findings in the

On November 1, 1974, Leadership Homes signed back its rights to the subject property to Cortese Land Company.

On January 20, 1975, Leadership filed a claim for damages with the city which stated that Leadership had purchased the Cortese property pursuant to contract.

City of Walnut Creek filed this action in eminent domain on February 11, 1975, against Cortese Land Company, Leadership Homes, et al.

This proceeding was regularly commenced in the proper county to condemn that certain property described in the complaint for a public use authorized by law, and the taking of said property is necessary for such use.

Leadership Homes filed its answer to the complaint and its cross-complaint for damages.

After filing this action, Cortese and the City of Walnut Creek arrived at an agreement for the purchase of the property by deed, and dismissals were filed as to all defendants except Leadership.

On February 11, 1975, Leadership had no right, title or interest in the property. Whatever rights Leadership had pursuant to the contract were terminated on November 1, 1974.

The trial court concluded that plaintiff is entitled to a judgment in condemnation decreeing that defendant, Leadership Housing Systems, Inc., dba Leadership Homes of Northern California, has no right, title or interest in said property and is not entitled to share in the award herein; that the action of cross-defendant, City of Walnut Creek, does not constitute a compensable taking or damaging of the property of cross-complainant; and that cross-defendant is thus entitled to a judgment in its favor.

Following the entry of judgment this appeal ensued.

---

Council agenda summary, and for these reasons, motion by Hazard, second by Schroader and unanimously carried to deny the appeal of Leadership Homes in the matter of H-P-D permit application H-5, based on the findings contained in Planning Commission Resolution 1570 which the Council incorporates as its own."

In *County of San Diego* v. *Miller* (1975) 13 Cal.3d 684 [119 Cal.Rptr. 491, 532 P.2d 139], the court observed: "The option has become a prevalent method for securing to a potential land buyer the ability to ultimately purchase the land—while affording him the opportunity to undertake and complete the often expensive and lengthy process of determining whether his intended use of the land will be permitted." (13 Cal.3d at p. 692.) Having so noted, the court held, "We conclude that the owner of an unexercised option to purchase land possesses a property right which—if taken by government—is compensable under article I, section 19. The measure of damage to the optionee shall be the excess—if any—of the total award above the optioned purchase price." (*Id.*, p. 693.)

■ Since Leadership's option had expired prior to the filing of the condemnation action, the court properly denied it the relief sought in its answer. ■ The remaining question is whether, as alleged in the cross-complaint, the city's actions in connection with Leadership's attempts to secure the permits required for development, as contemplated by the option agreement, constituted a de facto taking of its rights under the option before November 1, 1974, when they were surrendered to the owner. A ready answer is furnished by examination of the agreement of January 28, 1974. It indicates that the parties were speculating as to whether 139 or 222 units could be constructed on the property, and that if the bond issue failed to carry, the latter figure might apply, whereas, if it passed, less than 139 units might be permitted, and in such event Leadership would be relieved of all obligations under the agreement.

Leadership contends that when prior to the date of filing, the condemning authority has so acted as to damage or completely destroy the property in issue, then the date of the taking in condemnation is not the date of filing, but the earlier date of injury, and the destruction is the de facto taking in condemnation. It relies on principles enunciated and applied in *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]; *Peacock* v. *County of Sacramento* (1969) 271 Cal.App.2d 845 [77 Cal.Rptr. 391]; and *Sneed* v. *County of Riverside* (1963) 218 Cal.App.2d 205 [32 Cal.Rptr. 318]. (See also *Eldridge* v. *City of Palo Alto* (1976) 57 Cal.App.3d 613 [129 Cal.Rptr. 575].)

We may summarily disregard *Peacock*, *Sneed* and *Eldridge*. In each of those cases, unlike this case, there was a change in zoning which arguably was designed to obtain ends which the regulating governmental

body was only entitled to obtain through paying fair compensation. (See 271 Cal.App.2d at pp. 848-849; 218 Cal.App.2d at p. 212; 57 Cal.App.3d at p. 628; and *Dale* v. *City of Mountain View* (1976) 55 Cal.App.3d 101, 110 [127 Cal.Rptr. 520].) In fact in *Sneed* there was an actual invasion of air space over the plaintiff's property, pursuant to government sanction. *Peacock* and *Sneed* were distinguished in *Klopping* as follows: "In de facto taking cases, the landowner claims that because of particularly oppressive acts by the public authority the 'taking' actually has occurred earlier than the date set by statute (Code Civ. Proc., § 1249). (See *Foster* v. *City of Detroit, Mich., supra,* 254 F.Supp. 655.) The prevailing rule, as stated recently by the New York Court of Appeals in *City of Buffalo* v. *J. W. Clement Co., supra,* 321 N.Y.S.2d 345, 356, is that before a de facto taking results there must be a 'physical invasion or direct legal restraint . . . .' (See also 4 Nichols, *supra,* § 12.3151[5], at p. 336.) One example of a 'legal restraint' discussed in several California cases has been a particularly harsh zoning regulation, often calculatingly designed to decrease any future condemnation award. (*Peacock* v. *County of Sacramento, supra,* 271 Cal.App.2d 845, 856, 862-864; *Sneed* v. *County of Riverside* (1963) 218 Cal.App.2d 205, 209-211 . . .; *Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454, 458-460 . . . .)" (8 Cal.3d at p. 46. See also *City of Los Angeles* v. *Monahan* (1976) 55 Cal.App.3d 846, 852 [127 Cal.Rptr. 763].) As is demonstrated below, the acts of the city, other than rezoning, upon which Leadership relies, do not fall within the ban of *Peacock, Sneed* or *Eldridge.*

In *Klopping* the court ruled, "Accordingly we hold that a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (8 Cal.3d at p. 52, fn. omitted.) The particular facts in *Klopping* and the effect of that holding have been analyzed as follows: "In *Klopping,* the City of Whittier initiated condemnation proceedings against the plaintiff's property. Subsequently, the city dismissed the action but declared its intention to take the precise property in the future. Plaintiffs sued in inverse condemnation, alleging that the fair market value of their properties had declined as a result of the city's announcement of its intention to condemn, that there was a cloud over their property, and that they had lost rentals as a result of the city's conduct. We held that if the city had acted unreasonably in issuing precondemnation statements, either by excessively delaying eminent

domain proceedings or by other oppressive conduct, the owner was entitled to maintain an action in inverse condemnation." (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 119 [109 Cal.Rptr. 799, 514 P.2d 111].)[4]

We turn to the acts of the city relied upon by Leadership to determine whether they fall within those proscribed by *Klopping*. It first states, "In this case, the denial of permits by both the PLANNING COMMISSION and by the CITY COUNCIL are evidence of the continuing intent of the CITY to condemn and are not the basis of suit." As the record indicates the failure of the proposed development to "be consistent with the Open Space Element and its Action Program of the General Plan" was only one of the reasons for rejection by the planning commission on September 10, 1974. (See fn. 2 above.) The city council also considered factors other than the proposed condemnation when it approved the action of the planning commission and denied Leadership's appeal on October 14, 1974. We cannot presume that these acts were spurious. The closing clause of Leadership's statement properly recognized that an action in inverse condemnation is not the remedy for the improper denial of a permit, if such had been the case. ■ A petition for a writ of mandate, not inverse condemnation or an action for damages, is the appropriate remedy for abuse of discretion in refusing a permit. (*Selby Realty Co. v. City of San Buenaventura, supra,* 10 Cal.3d 110, 127-128. See also *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 513 and 516 [125 Cal.Rptr. 365, 542 P.2d 237] [cert. den. (1976) 425 U.S. 904 (47 L.Ed.2d 754, 96 S.Ct. 1495)]; *State of California v. Superior Court (Veta Company)* (1974) 12 Cal.3d 237, 246-247 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Pinheiro v. County of Marin* (1976) 60 Cal.App.3d 323, 326, fn. 2 [131 Cal.Rptr. 633]; and *Dale v. City of Mountain View, supra,* 55 Cal.App.3d 101, 108.)

■ Leadership's argument continues, "Those denials are only further evidence of an earlier intended condemnation by the CITY and the carrying out of that intent long prior to the actual filing of suit herein." There was no need for further evidence of the intended condemnation by the city. The property was included in an open space plan approved in November 1973. As we have pointed out, Leadership

---

[4]We note that Leadership's position is analogous to that of the coplaintiff Sarff in *Klopping.* (See 8 Cal.3d at p. 45, fn. 2.) He too had lost his interest in the property by the time the city commenced its second condemnation action. He was allowed to sue for his alleged loss of rental value for the period prior to the time he lost the property by foreclosure. (See 8 Cal.3d at pp. 45-46, fn. 2 and 58.)

contracted with the owner on the basis that there was a bond election forthcoming to secure funds to purchase the property. When the bond election passed, Leadership sought to persuade a change in policy under which in return for the dedication of 100 acres it would be permitted to develop 39 acres. There was not, however, any invasion of the property by the city prior to the time Leadership surrendered the option. The right of a governmental body to plan for the acquisition of property is unquestioned. In the absence of special circumstances it does not give rise to an action for inverse condemnation. In *Selby Realty* v. *City of San Buenaventura, supra,* the court stated: "Neither *Klopping* nor any other decision of which we are aware holds that the enactment of a general plan for the future development of an area, indicating potential public uses of privately owned land, amounts to inverse condemnation of that land." (10 Cal.3d at p. 119.)

More specifically Leadership alleges, "The CITY has by its pre-election statements seeking to set aside the complete Rudgear Meadows area as an Open Space area, by the passage of the Bond issue of June 6, 1974, by the letter and acts of EDWIN PEABODY of June 7, 1974 taking the Rudgear Meadows property off calendar and by the statements to CHRIS BODDUM [5] has indicated that long prior to the actual date of filing the CITY had de facto condemned the Rudgear Meadows property. It would be accurate to say that at least by September 9, 1975 the CITY had de facto taken the Rudgear Meadows Property. Looking at the whole sequence of events, the obvious purpose and intent of the CITY OF WALNUT CREEK was to prevent the Rudgear Meadows property from being developed during the period when there was no legal barrier to such development."

As we have seen the inclusion of the property for public use in a general plan does not give rise to a cause of action. If calling a bond election and urging passage to secure funds for a public purpose constituted a taking, the agency so acting would be subject to suit

---

[5]Leadership on December 19, 1975, made an offer of proof that Boddum, an employee of their engineer, would testify that on September 5, 1974, the Community Development Director of the city told him that he "wanted to make it clear, that even if all the Planning Commission's Staff objections were complied with by LEADERSHIP and a plan was submitted to and approved by the Design Review Committee of the Planning Commission, a denial would still be recommended by the Planning Commission based upon non-conformance to the Open Space Element of the General Plan." The record indicates that the court rejected the offer of proof. Properly so; there was no showing that the action of that official could bind the planning commission or the city council with respect to either the grant or denial of a permit, or authorizing an action in eminent domain.

whether or not the issue carried. The expression of political preference cannot be so burdened. It was reasonable to assume after the bond issue carried, particularly in the light of Leadership's contract with the owner, that the attempted development of the land would be abandoned.[6] When it was notified to the contrary, the planning commission and other authorized agencies and agents of the city proceeded to process Leadership's application in a manner, so far as appears from the record, provided by applicable law.

■ We have also considered whether the city excessively delayed its eminent domain action. It is obvious that it would have been risky and subjected the city to possible liability for costs if the action had been instituted before the bond election established that there would be funds for the purchase of the property. Even with the funds authorized, they had to be realized by sale of the bonds, the properties desired had to be appraised, and negotiations instituted with the owner. It does not appear as a matter of law that there was an unreasonable delay. (See *Elgin Capital Corp.* v. *County of Santa Clara* (1975) 57 Cal.App.3d 687, 690-692 [129 Cal.Rptr. 376]; *City of Los Angeles* v. *Monahan, supra,* 55 Cal.App.3d 846, 853; and *Smith* v. *State of California* (1975) 50 Cal.App.3d 529, 535, 537 [123 Cal.Rptr. 745].) The delay until October 14, 1974, may be attributed in part to Leadership which was insisting that the city review its proposal to donate 100 acres in return for permission to develop the balance of the property under the option. When it lost that battle it threw in the sponge and it was not damaged by any delay between November 1, 1974, and the time suit was actually filed.

We also note that the landowner received the full option price for the property from the city. If Leadership had kept its option alive, and had established a right to develop the 139 units, it still would have found itself faced with the inference that the price in the option was a fair market price for the property if it was subject to development on that scale. In other words, as developable but undeveloped property there was little chance that there would have been an excess value over the option price. It is that fact, rather than any improper act of the city, which led to the abandonment of the option. Leadership gambled twice;

---

[6] Since it is not necessary to do so in this case, we do not pass upon the question of the right of the condemning authority to declare a moratorium on the development of parcels previously planned for public use during a reasonable period of time, after funds became available to secure such property, and while it is proceeding to determine which parcels should be purchased. (See *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 800-802 [132 Cal.Rptr. 386, 553 P.2d 546]; and *State of California* v. *Superior Court* (Veta Company), *supra,* 12 Cal.3d 237, 252-255.)

first, that the bond issue would not pass, and, second, that it could induce the city to trade off 100 acres for development rights on the balance. It lost both times, but it never had a vested interest in an economic benefit in the land which was taken by the city without compensation. The compensation paid to the owner was adequate, and was all that the land was worth as developable land.

The judgment is affirmed.

Elkington, J., and Lazarus, J.,* concurred.

A petition for a rehearing was denied September 27, 1977, and appellant's petition for a hearing by the Supreme Court was denied October 27, 1977.

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.