[Civ. No. 44189. First Dist., Div. Two. Oct. 30, 1979.]

MITZI S. BRIGGS, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA ex rel. DEPARTMENT OF
PARKS AND RECREATION, Defendant and Appellant.

COUNSEL

Jackson & Gughemetti, Jess S. Jackson, Jr., and Gideon Kanner for Plaintiff and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Robert L. Bergman, R. H. Connett and N. Gregory Taylor, Assistant Attorneys General, Leonard M. Sperry, Jr., Christopher M. Ames and Richard C. Jacobs, Deputy Attorneys General, for Defendant and Appellant.

OPINION

**TAYLOR, P. J.**—The State of California, acting by and through the Department of Parks and Recreation (Department) appeals from a judgment in inverse condemnation awarding damages in excess of the sum of $6 million to the property owner, Briggs, contending that: 1) Briggs had no cause of action for damages for inverse condemnation as

a result of the California Coastal Zone Conservation Commission's (State Commission) denial of a permit or the Department's manifestation of an interest in acquiring the property; 2) the findings are not supported by the record and do not support the judgment; and 3) in the alternative, even if Briggs is entitled to damages for inverse condemnation, the amount awarded was excessive and an erroneous rate of prejudgment interest was applied; Briggs cross-appeals, contending that the court erred by limiting her postjudgment interest to 7 percent and failing to award her reasonably incurred litigation expenses pursuant to Code of Civil Procedure section 1036. We have concluded that the judgment must be reversed as it was predicated on the erroneous legal theory that Briggs had a cause of action for inverse condemnation; accordingly, the remaining contentions on appeal and the issues raised by the cross-appeal need not be addressed.

As we have concluded that the judgment was based on an error of law, we shall not set forth in detail the trial court's findings and conclusions.[1] We trace the factual and procedural history in the light of the evidence relevant to our discussion: Since 1963, Briggs owned the subject property, 35.6 acres of raw, undeveloped land on the coast in Monterey County (County). In October 1972, Briggs obtained building permits from the County for development of three small residential homes on the property. Prior to November 8, 1972, Briggs commenced construction on the property, including commencement of excavations for footings, and placements of concrete foundations. On March 19, 1973, she obtained two new permits for different and much larger houses upon cancellation of the earlier permits. On April 4, 1973, Briggs applied to the County for approval of a "Minor Subdivision" development on the subject property and stated in her application that the property would be used for three single family residences. The County approved Briggs' application on November 7, 1973.

On April 16, 1973, Briggs filed an application for a development permit with the Central Coast Regional Commission (hereafter Regional Commission) of the State Commission, seeking a development permit for the construction of three single family residences and accessory structures as approved by the County in March 1973; she also filed for an exemption for construction of the three residences.

---

[1]Nor will we discuss the errors in the findings and conclusions or the insufficiency of the evidence unless pertinent to our disposition of the appeal.

On May 17, 1973, William Penn Mott, Jr., then Director of Parks and Recreation of the State of California, sent to Olney Smith, executive director of the Regional Commission, a telegram stating: "The California Department of Parks and Recreation considers the Briggs property desirable as an addition to the existing Carmel River State Beach property." On May 18, 1973, Milton Frincke, District Superintendent of the Department of Parks and Recreation, Operations Division, District 4, executed and sent a letter to Smith stating: "We are very concerned about the possibilities of a proposed large scale development on the Briggs property, adjacent to the Carmel River State Beach. This is immediately south of Carmel Meadows. When plans are proposed, we would like to comment."

■ ■■■■■ On June 18, 1973, after a public hearing, the Regional Commission passed a resolution denying Briggs' application for a permit.[2]

On August 8, 1973, the State Commission denied Briggs' application for a permit, for the following reasons, as stated in its staff recommendation: "1. *Open Space Use.* The parcel is one of two privately-owned coastal areas between Point Lobos and the mouth of the Carmel River. The California Department of Parks and Recreation considers the property desirable as an addition to the Carmel River State Beach property. *Although the State Parks Department does not have a definite commitment to purchase the property, there is clearly a need for preserving the Commission's planning options as to coastal parks in this area.* Because of the manner in which the 3 homes would be spaced along the ocean bluff, construction of the homes would foreclose the possibility of acquiring either all the ocean front property or acquiring only portions and allowing the rest to be developed.

"*Even if the Commission's planning process were to determine the acquisition is not desirable, it is too early in the planning process to decide that development should proceed in the manner proposed by applicant.* It might be preferable to require clustered development on the portion of the property adjoining an existing subdivision, with the re-

---

[2]The court's findings placed undue emphasis on the procedures and decision of the Regional Commission. The proceedings before the State Commission, however, are de novo and completely nullify the former determinations of the Regional Commission (*REA Enterprises v. California Coastal Zone Conservation Com.,* 52 Cal.App.3d 596, 612-613 [125 Cal.Rptr. 201]).

mainder of the property left as open space, to maintain as much as possible of the scenic qualities of the property.

"2. *Inducement to Development.* Although the proposed project consists only of the construction of 3 large homes, the applicant's claim of exemption states that the total development will have 2 more stages, 1 of which is a subdivision application in operation and the second of which is a planned unit development currently in the si [*sic*] stage. Once the 3 homes are built, the property will be foreclosed from any significant open space or recreational use along the ocean front, which will in turn on [*sic*] that the property will be committed to further development. The road servicing the three homes runs along almost the entire ocean frontage of the property and together with utility extensions would encourage further development" (italics partially added). █ Briggs filed no mandate action to challenge the decisions of the State Commission.[3]

On September 7, 1973, Joseph Bodovitz, executive director of the State Commission, notified Briggs that her appeal on an application for an exemption had been denied because she had not obtained building permits for the projects for which she claimed vested rights prior to the effective date of the act, and the expenditures made were not in reliance on the plans for which building permits had been issued prior to November 8, 1972.

On September 28, 1973, William Penn Mott, Jr., executed and sent a letter to Briggs stating, in part, "in reply to an inquiry from the Coastal Zone Conservation Commission this department [Parks and Recreation] informed the Commission that *it does have an interest* in acquiring your property in the Carmel area *and will take further steps* to do so *when funds are available for such purpose."* (Italics added.) On October 31, 1973, Lt. Governor Ed Reinecke executed and sent a letter to Briggs stating, in part, that he had been in contact with Mott and that the State of California was very much interested in purchasing the subject property.

---

[3]Pursuant to the then applicable provisions of former Public Resources Code section 27424, a petition for mandate had to be filed within 60 days after the State Commission's decision (see present Pub. Resources Code, § 30801). Her failure to do so renders the State Commission's decision immune from objections in a collateral proceeding (*Stockton* v. *Department of Employment,* 25 Cal.2d 264, 267-268 [153 P.2d 741]; *DeCelle* v. *City of Alameda,* 221 Cal.App.2d 528, 535 [34 Cal.Rptr. 597]).

On May 9, 1974, Briggs and her attorneys met with Mott and Les McCargo of the Department. At that time, Briggs and her attorneys advised Mott that the state's conduct had prevented development and viable use of the subject property, and caused financial and economic injuries to Briggs. Briggs and her attorneys further informed Mott that unless the state gave some assurances that the property will be directly condemned then she would have to commence an inverse condemnation action, among other legal remedies. Mott then assured Briggs that the Department had an interest in acquiring her property and that it was among the top properties in the state for public acquisition. Mott also indicated to Briggs that a condition[4] of the Department's acquisition of the property was passage by the California voters of the June bond issue (State Beach, Park Recreation and Historical Facilities Bond Act of 1974) and that if this bond measure passed, the state would promptly acquire the subject property.

On May 9, 1974, after the above meeting, Mott executed and delivered a letter drafted by Briggs' attorney to Briggs, stating that the Department "intends to acquire, by negotiation or condemnation, fee title to your property above referenced if the pending ballot measure authorizing the issuance of Bonds is passed by the electorate this June, 1974. *In the event said bond issuance is approved,* the State Park and Recreation *will then adopt a resolution* authorizing said acquisition, and *we will commence appraisal procedures and we will negotiate with you* to acquire said property. . . . As we have previously stated, *we have been interested in acquiring this property for many years, but have been unable to do so for the sole reason that funds to acquire the same have been unavailable.* If the Bond issue passes, this property will be included for prompt acquisition inasmuch as sufficient funds will then be available when the bonds are marketed" (italics added).

On June 4, 1974, the California electorate passed the bond issue. Thereafter on July 12, 1974, the Department passed a resolution directing, pursuant to the State Beach, Park, Recreational and Historical Facilities Bond Act of 1974, a study of a project involving an addition to the Carmel River State Beach, recommended this project, subject to the procedures of the bond act, and such implementation as necessary by the Director of the Department.

---

[4]The trial court's findings that the passage of the bond issue was the only condition to the state's acquisition and that all other steps were mere procedural formalities is not supported by the evidence.

On July 23, 1974, Mott executed and sent a memorandum to Norman B. Livermore, Secretary for Resources, that: 1) designated the Briggs' property within the acquisition program derived from the State Beach, Park, Recreational and Historical Facilities Bond Act of 1974; and 2) designated funds for acquisition of the Briggs' property; and 3) stated the "scope" of the project as "to insure the continued scenic beauty of this green space, provide public access to the public beach, and to tie together portions of the Carmel River State Beach separated by a physical barrier"; and 4) stated that the recommended future state development "would include hiking trails, scenic overlook and possible picnic area development"; and 5) stated that the Briggs property "is presently threatened with residential development"; and 6) stated that "the outstanding scenic qualities of this parcel make it a desirable addition to the Carmel River State Beach, Point Lobos complex"; and 7) stated that the operational effectiveness of the park unit would be enhanced by merging the separated sections of Carmel River State Beach that then could be more effectively patrolled and a considerable time saving in maintenance; and 8) concluded "this property is threatened by development and should be preserved for public use. This property will add needed upland to an existing State Beach, supplying access to the beach and to scenic overlook areas."

On September 27, 1974, the Governor signed chapter 1484, Statutes of 1974, item 410.7B(ii) authorizing $1.75 million for acquisition of the Briggs property from the State Beach, Park, Recreation and Historical Facilities Fund of 1974. Subsequently, efforts were made to find a manageable method to meet the public prescriptive easement requirement of the statute. After several months of meetings to iron out the difficulties with the prescriptive easement investigation procedure, the Legislature changed the procedure, effective May 2, 1975.

After January 1, 1975, a change of administration occurred with the election of a new Governor and appointment of new Secretary of Resources and Director of Parks and Recreation. Acquisition projects then in progress were held in abeyance pending review by the Secretary of the Resources Agency.

In January 1975, review of the Department's budget estimate for acquisition of the subject property was requested of the Real Estate Services Division of General Services. The acquisition request by the Department to the Department of General Services to commence acqui-

sition procedures regarding the Briggs property was made in May 1975, after the passage of the legislation which changed the provisions regarding prescriptive easement investigations. After passage of this measure, the General Services Department began the implied dedications study of all the property provided for in the appropriations bill.

Briggs filed the instant inverse condemnation action on August 2, 1975.

On October 28, 1975, the prescriptive easement investigation as to the Briggs property was concluded. The state could not commence the appraisal phase of the acquisition until after the prescriptive easement investigation was concluded. In December 1975, a contract was signed for an independent appraisal of the subject property. The appraisal was originally scheduled for completion by May 1976, but the appraiser's trial schedule required an extension; the appraisal was delivered on June 16, 1976.

On August 30, 1976, the Public Works Board authorized the Department of General Services to negotiate for the property and approve an augmentation to the amount previously budgeted because the appraiser's value was higher than that previously budgeted. On September 27, 1976, the Public Works Board passed a resolution authorizing the acquisition of the subject property. On December 31, 1976, the state filed a direct condemnation action against the property.[5]

The court found that: After May 1973, the state's denial of Briggs' applications and acquisition activitities: 1) caused the property to be unmarketable in the open market in relation to its fair market value, or otherwise, and to have no viable economic use or return in relation to its value, or otherwise; 2) blocked and prevented any higher use or return on the subject property or the proceeds from a fair market sale. The court also found that as a direct and proximate result of the state's assurances, representations and promises to acquire the subject property from and after May 1974, Briggs ceased further attempts to develop any economic use of her property and incurred substantial economic and financial losses and damages to her property, as well as delay in payment of just compensation, and that the State Commission's denial

---

[5]In *People* v. *Superior Court (Briggs)*, No. 44236, decided November 17, 1978, this court issued a peremptory writ of mandate staying the trial of the condemnation action until the final determination of the instant appeal.

of Briggs' application for a development permit and exclusions were pursuant to a policy to preserve the subject property in its then undeveloped status pending its acquisitions.

The trial court concluded that on March 27, 1975, the state had accomplished a de facto taking of the Briggs property and that, therefore, she was entitled to receive the fair market value of the property as of that date, damages incurred between the denial of the permit on August 8, 1973, and the taking, on March 27, 1975, and interest from the date of taking. The valuation phase commenced on August 29, 1977, and the jury rendered a verdict of $3.9 million as the fair market value of the property on March 27, 1975. Briggs' other claims for damages were bifurcated and tried by the court. On March 30, 1978, judgment was entered in favor of Briggs in the sum of $6,429,437, offset by the Department's previously deposited sum of $1.75 million, or a total of $4,679,437; this amount included the fair market value of the property ($3.9 million), damages of $469,300 for the 19-month period (Aug. 1973-Mar. 1975) and over $1 million in prejudgment interest. Briggs also recovered litigation expenses of $957,002, including attorney fees in the amount of $751,500. This appeal and Briggs' cross-appeal ensued.

 As indicated above, the trial court found and concluded that as a result of the State Commission's denial of Briggs' application for a permit as a result of the Department's interest in, and intent to acquire, the property, the Department was liable to Briggs in inverse condemnation. The court's findings and conclusions are contrary to *State of California* v. *Superior Court (Veta)* 12 Cal.3d 237 [115 Cal.Rptr. 497, 524 P.2d 1281], and its progeny. In *Veta*, our Supreme Court considered a claim of inverse condemnation based on the denial of a permit application by the State Commission under the 1972 act[6] and the allegation that the permit was denied in order that the affected property would "'remain undeveloped and devoted to, and held for, public use as open space land'" (p. 252). The court, at page 253, rejected the claim that such a denial amounted to a constitutional "damaging" of property, on the ground that the coastal act was only an interim measure

---

[6]The California Coastal Zone Conservation Act of 1972 was enacted by the People of the State of California as an initiative measure on November 7, 1972. The act declared the California Coastal Zone to be a "delicately balanced ecosystem" whose preservation and protection for present and succeeding generations was a matter of paramount concern to the state and nation (former Pub. Resources Code, § 27001).

The 1972 act created the California Coastal Zone Conservation Commission and six regional commissions; it directed them to undertake whatever studies were necessary to

designed "to assure that developments in the coastal zone are consistent with the objectives of the act so that priceless coastal resources are not irreversibly committed to uses which would be inconsistent with the plan ultimately developed."

Our Supreme Court noted that numerous cases had previously upheld the validity of temporary regulatory measures enacted to preserve the status quo pending adoption of a comprehensive land use plan, and that the 1972 Coastal Act was designed to accomplish a similar purpose. The court held that the State Commission's denial of a permit was indistinguishable from that involved in *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation, etc. Com.*, 11 Cal.App.3d 557 [89 Cal.Rptr. 897]. In *Candlestick*, this court (Div. Four) upheld the validity of the denial of a permit to fill the San Francisco Bay, even though the complaint alleged that the property had been rendered completely valueless.

As this court recently indicated in *People* v. *Superior Court (Tidwell)* 91 Cal.App.3d 95, 108-109, [154 Cal.Rptr. 54], since *Veta, supra,* a number of Courts of Appeal have held that the denial of a building permit during the preparation of the coastal zone plan does not amount to a taking of property for public use without compensation (*Patterson*

---

determine the proper planning principles and assumptions needed to ensure the conservation and protection of coastal zone resources. Based upon those studies, the Commissions were directed to develop and adopt a California Coastal Zone Conservation Plan for submission to the Legislature (former Pub. Resources Code, §§ 27200-27201; 27300-27304; 27320).

During the period necessary for preparation of the plan and consideration of the plan and consideration of it by the Legislature, the Commissions were granted broad regulatory controls over proposed developments within the permit area of the coastal zone. Any person who wished to develop property within the zone was required to obtain a permit from the appropriate Regional Commission; any determination by the Regional Commission was thereafter subject to de novo review on appeal by the State Commission. (Former Pub. Resources Code, §§ 27400, 27423.) The Commissions could approve such an application only if they found that the proposed development would not have a substantial adverse environmental or ecological effect, and would not be inconsistent with the policies and objectives of the act (former Pub. Resources Code, §§ 27400, 27423, 27402).

The 1972 act, by its own terms, expired on December 31, 1976 (former Pub. Resources Code, § 27650). Prior to that time, however, the Commissions had prepared the California Coastal Plan and had submitted it to the California Legislature. The Legislature found that the plan conformed to the requirements of the 1972 legislation (Pub. Resources Code, §30002). The Legislature further concluded that some of the recommendations of the Commissions were appropriate for immediate implementation, that some of them required further study, and that other similar means were appropriate for implementation. The Legislature then enacted the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.).

v. *Central Coast Regional Com.*, 58 Cal.App.3d. 833 [130 Cal.Rptr. 169]; *Davis* v. *California Coastal Zone Conservation Com.*, 57 Cal. App.3d 700 [129 Cal.Rptr. 417]; *Reed* v. *California Coastal Zone Conservation Com.*, 55 Cal.App.3d 889 [127 Cal.Rptr. 786]; *CEEED* v. *California Coastal Zone Conservation Com.*, 43 Cal.App.3d 306 [118 Cal.Rptr. 315]). In *Patterson, supra,* this court (Div. Four) recognized, at page 849, that designation of coastal properties for priority acquisition that would then lead to the mobilization of funds and the decision whether or not to acquire the property so designated, was a "... 'mandatory element of the forthcoming Coastal Zone Conservation Plan,'" and a legitimate exercise of the police power that did not amount to inverse condemnation.[7] Here, the State Commission's denial of Briggs' permit was an exercise of the statutory mandate. The Department's expression of interest in acquiring the Briggs property when funds became available was, at most, a designation and assignment of priorities so that resources could be mobilized.

Recently, in *Agins* v. *City of Tiburon,* 24 Cal.3d 266, at pages 272-273, [157 Cal.Rptr. 372, 598, P.2d 25], our Supreme Court discussed the reasons underlying its ruling in *Veta, supra,* and rejected a constitutional argument similar to that made by Briggs here. In doing so, our Supreme Court said, at page 272: "Plaintiffs contend that the limitations on the use of their land imposed by the ordinance constitute an unconstitutional 'taking of [plaintiffs'] property without payment of just compensation' for which an action in inverse condemnation will lie. Inherent in the contention is the argument that a local entity's exercise of its police power which, in a given case, may exceed constitutional limits is equivalent to the lawful taking of property by eminent domain thereby necessitating the payment of compensation. We are unable to accept this argument believing the preferable view to be that, while such governmental action is invalid because of its excess, remedy by way of damages in eminent domain is not thereby made available. This conclusion is supported by a leading authority (1 Nichols, Eminent Domain (3d rev. ed. 1976) Nature and Origin of Power, § 1.42 (1), pp. 1-116 through 1-121)...."

The court (at p. 273) also reiterated that the proper and sole remedy is administrative mandamus. As indicated above, Briggs failed to pur-

[7]Even prior to the coastal legislation, the courts upheld against claims of inverse condemnation, temporary or interim measures restricting development while public entities considered the properties for purchase (*Metro Realty* v. *County of El Dorado,* 222 Cal.App.2d 508 [35 Cal.Rptr. 480]; *Hunter* v. *Adams,* 180 Cal.App.2d 511 [4 Cal.Rptr. 776]).

sue this remedy. Her contention on appeal that to do so would have been an idle act is spurious.

Briggs, however, contends that the trial court's ruling was correct, as the above authorities are distinguishable since in the instant case the Department indicated to the Regional and State Commissions that the property would be a desirable addition to the State Park System and this indication had a permanent effect of diminishing the value and development potential of her property. As indicated above, even if so, Briggs' remedy was by mandamus (*City of Walnut Creek* v. *Leadership Housing Systems, Inc.*, 73 Cal.App.3d 611, 621 [140 Cal.Rptr. 690]). We think that the authorities cited above clearly indicate that it was constitutionally proper for the State Commission in denying Briggs' permit to rely on the Department's expression of interest in Briggs' property.

■ Briggs' contentions also ignore the fact that the State Commission's denial of her permit was based on grounds totally independent of the Department's interest in purchasing her property. The court so found and the record indicates that the State Commission's denial was also based on: 1) the need for preserving its planning options as to coastal parks, independent of the purchase; and 2) in the absence of acquisition to consider the effect of Briggs' entire plan on the development of the area. Both of these were proper and consistent with the statutory mandate of the "permanent protection" of the remaining natural and scenic resources of the coastal area and preserving its amenities and aesthetic values (former Pub. Resources Code, §§ 27001, 27302, 27402; *Coastal Southwest Dev. Corp.* v. *California Coastal Zone Conservation Com.*, 55 Cal.App.3d 525, 532-536 [127 Cal.Rptr. 775]). *Coastal Southwest*, at page 537, also approved the consideration of the cumulative and overall impact of separate phases of an overall project. The protection of open space by limiting private use was aptly explained as to the private operation of a country club and golf course by this court (Div. One) in *Friedman* v. *City of Fairfax*, 81 Cal.App.3d. 667 [146 Cal.Rptr. 687], at page 677: "While a conceived objective of preserving a scenic, historical and singularly desirable open-space resource may result in conferring a public *benefit*, such an otherwise valid purpose and attendant result is not the equivalent of a public *use* requiring compensation."

Thus, pursuant to the holding of this court in *City of Walnut Creek* v. *Leadership Housing Systems, Inc., supra,* 73 Cal.App.3d, page 621,

the permit denial was based on several independent reasons and, therefore, could not provide a basis for the inverse condemnation judgment. Nor is there any merit to Briggs' attempt to distinguish *City of Walnut Creek, supra*, on grounds that the State Commission's decision (unlike that of the *City of Walnut Creek*) was not based on an objectively ascertainable standard. In *CEEED v. California Coastal Zone Conservation Com., supra*, 43 Cal.App.3d, pages 325-327, the court compared the standards of a number of zoning ordinances with the 1972 act and concluded that the standards under the act were sufficient and dictated by the very nature of the legislative goals which also required the vesting of considerable discretion in the State Commission.

Briggs also argues that liability was established, as the Department's expression of interest was a "substantial contributing cause" of the damage. Van Alstyne, however, concludes that one of the limitations of the "substantial contributing cause rule" is the exclusion of nonphysical consequential damages (Van Alstyne, *Inverse Condemnation: Unintended Physical Damage*, 20 Hastings L.J. 431, 434-435 et seq.).

The State Commission's denial of the permit for reasons independent of the Department's acquisitory interest are beyond attack, as indicated above in footnote 3, page 196, and do not, as a matter of law, support the trial court's conclusion of inverse condemnation.

Briggs further argues that her cause of action is supported by *Klopping* v. *City of Whittier*, 8 Cal.3d 39 [104 Cal.Rptr. 1,500 P.2d 1345]. In *Klopping*, the City of Whittier had actually initiated condemnation proceedings but then dismissed the action when it became involved in other litigation that jeopardized the funding for the property. The city's resolution authorizing the dismissal of the condemnation action simultaneously declared the city's firm intention to reinstitute the condemnation proceedings when and if the other litigation was terminated in the city's favor. Our Supreme Court held (at p. 52) that the property owner was entitled to maintain an inverse condemnation action if: 1) the public authority acted unreasonably in the precondemnation activities, either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and 2) as a result of the public authority's action the property suffered a diminution of value. The court expressly indicated in footnote 5, at page 52: "Only in unusual circumstances would an announcement of intent to condemn constitute a de facto taking."

The general principles announced in *Klopping, supra,* were further defined and refined in *Selby Realty Co.* v. *City of San Buenaventura,* 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111]. In rejecting an argument based on *Klopping,* substantially identical to that made by Briggs here, our Supreme Court said at pages 120-121: "The deleterious consequences of haphazard community growth in this state and the need to prevent further random development are evident even to the most casual observer. The Legislature has attempted to alleviate the problem by authorizing the adoption of long-range plans for orderly progress. Thus, it has provided not only for the adoption of general plans but also regional plans (§ 65060 et seq.), specific plans (§ 65450 et seq.), district plans (§ 66105 et seq.), and a comprehensive plan for the conservation of San Francisco Bay (§ 66650 et seq. ). In addition, the voters recently passed an initiative measure providing the mechanism for adoption of plans to preserve and protect the state's coastline. (Pub. Resources Code, § 27000 et seq.)

"If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land. We indulge in no hyperbole to suggest that if every landowner whose property might be affected at some vague and distant future time by any of these legislatively permissible plans was entitled to bring an action in declaratory relief to obtain a judicial declaration as to the validity and potential effect of the plan upon his land, the courts of this state would be inundated with futile litigation. It is clear, under all the circumstances, that plaintiff has not stated a cause of action against the county defendants for either declaratory relief or inverse condemnation."

The trial court's finding that the State Commission's designation of the Briggs property for acquisition merely confirmed the state's preexisting intent[8] to acquire the property contravenes the above quoted portion of *Selby.* Nor can the Department's indication of its interest in the Briggs property be equated with the "intent to condemn" that under unusual circumstances could constitute a de facto taking under *Klopping, supra.*

---

[8]The record indicates that the State Public Works condemnation resolution was not passed until three years after the State Commission's denial of the permit.

█ Pursuant to the applicable statutes, the Department was able only to express its interest in the Briggs property. It was required to proceed in accordance with the Property Acquisition Law (commencing with Gov. Code, § 15850), and could not consummate the purchase of any property with funds from the 1974 act, unless the property was also approved by the State Park and Recreation Commission (Pub. Resources Code, § 5096.88) and the Secretary for Resources (§§ 5096.90, 5096.91), and until the Legislature and Governor had approved an appropriation of funds (§ 5096.91). Public Resources Code section 5096.94 also specifies that "Acquisition for the state park system by purchase or by eminent domain shall be under the Property Acquisition Law . . . notwithstanding any other provision of law." Government Code section 15855, subdivision (a) declared, so far as pertinent, that "the State Public Works Board is the only state agency that may exercise the power of eminent domain to acquire property needed by any state agency for any state purpose or function."[9]

Government Code section 15853 provides, so far as pertinent that "(b) Where moneys are appropriated . . . such moneys shall be expended in accordance with the provisions of this part, notwithstanding any other provisions of law." This provision clearly contemplates Public Works Board determination of the desirability of purchase, even *after* an appropriation is made. Thus, Government Code section 15860 explicitly states, so far as pertinent, that "Any appropriation for the acquisition of real property pursuant to this part may be expended for the payment of all costs and expenses, including . . . the fees and expenses of appraisers . . . necessarily incurred in the examination, *and the determination of the suitability of any real property to be acquired or under consideration for acquisition. . .* " (italics added). Thus, as a matter of law, at all times here pertinent, no action by the Department alone could give rise to inverse condemnation liability.

█ Further, the trial court here made no findings concerning unreasonable precondemnation activity. Such findings are necessary before liability can be imposed on the basis of *Klopping, supra,* 8 Cal.3d 39

---

[9]We recognize that this provision became effective on July 1, 1976. The fact that prior thereto the Department had statutory authority to condemn property (former Gov. Code, § 54093) is of no significance as under the then applicable procedures, that authority could be exercised only pursuant to the Property Acquisition Law. Section 5096. 94, quoted above, so stated. The then applicable provision of the Property Acquisition Act, former Government Code section 15855, then required a resolution by the Public Works Board.

(*Elgin Capital Corp.* v. *County of Santa Clara*, 57 Cal.App.3d 687 [129 Cal.Rptr. 376]). ■ In fact, the court could not have made such findings. The evidence, as a matter of law, establishes that there was no unreasonable period of delay between the passage of the condemnation resolution in September 1976 and the filing of the condemnation action on December 31, 1976. Code of Civil Procedure section 1245.260 requires the filing of the condemnation action within six months of the adoption of the resolution of necessity.

Briggs, however, also argues that the Department's activities in the context of the 1974 bond act constituted a de facto taking or justified damages under *Klopping, supra.* Identical contentions were rejected in *Helix Land Co.* v. *City of San Diego*, 82 Cal.App.3d 932, 945-948 [147 Cal.Rptr. 683]. In *City of Walnut Creek* v. *Leadership Housing Systems, Inc. supra,* 73 Cal.App.3d, page 623, this court concluded that the period of time necessary for the sale of bonds, the appraisal of the property, and negotiations with the landowner did not constitute unreasonable delay. In doing so, Justice Sims observed, at pages 622-623: "If calling a bond election and urging passage to secure funds for a public purpose constituted a taking, the agency so acting would be subject to suit whether or not the issue carried. The expression of political preference cannot be so burdened." The trial court found that the delay here was precisely for the time required for the passage and implementation of the 1974 bond act.

As we have concluded that there is no basis for liability in inverse condemnation, we need not reach the remaining issues raised by the appeal and those raised by the cross-appeal.

The judgment is reversed. Each party to bear its own costs on appeal.

Rouse, J., and Miller, J., concurred.

A petition for a rehearing was denied November 29, 1979, and the opinion was modified to read as printed above. The petition of the plaintiff and appellant for a hearing by the Supreme Court was denied January 24, 1980.