[Civ. No. 21589. Fourth Dist., Div. Two. Mar. 8, 1982.]

SYDNEY MARK TAPER, Plaintiff and Respondent, v.
CITY OF LONG BEACH, Defendant and Appellant.

CITY OF LONG BEACH, Plaintiff and Appellant, v.
SYDNEY MARK TAPER, Defendant and Respondent;
THE STATE OF CALIFORNIA, Defendant and Appellant.

592

COUNSEL

Robert W. Parkin, City Attorney, Arthur Y. Honda, Deputy City Attorney, and Edwin P. Martin for Plaintiff and Appellant and Defendant and Appellant.

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, and Robert G. Collins, Deputy Attorney General, for Defendant and Appellant State.

Meserve, Mumper & Hughes, Hodge L. Dolle, Sr., Hodge L. Dolle, Jr., and Judith P. Meyer for Plaintiff and Respondent and Defendant and Respondent.

OPINION

KAUFMAN, J.—These are appeals from judgments in coordinated actions in eminent domain and inverse condemnation.

### Procedural History

On February 7, 1977, Sydney Mark Taper as testamentary trustee of the Barry Hugh Taper Trust, later joined as a party plaintiff by Barry Hugh Taper (collectively the Tapers), filed an action in the Los Angeles Superior Court against the City of Long Beach (City) seeking damages for inverse condemnation, for unreasonable delay in instituting eminent domain proceedings and other oppressive conduct, and for breach of statutory duty under Government Code sections 7267.5 and 7267.6,[1] all in respect to a parcel of oceanfront property in Long

---

[1]Government Code section 7267.5 reads: "[¶] In no event shall the public entity either advance the time of condemnation, or defer negotiations or condemnation and the deposit of funds in court for the use of the owner, or take any other action coercive in nature, in order to compel an agreement on the price to be paid for the property."

Government Code section 7267.6 reads: "[¶] If any interest in real property is to be acquired by exercise of the power of eminent domain, the public entity shall institute

Beach.[2] (For convenience, the inverse condemnation action will be referred to as the inverse action.) On August 9, 1977, also in Los Angeles Superior Court, City filed an action in eminent domain in respect to the same property, naming as defendants the inverse action plaintiffs and, in addition, the State of California (the State).[3] (For convenience, the eminent domain action will be referred to as the direct action.) The two cases were coordinated pursuant to Code of Civil Procedure section 404 et seq., in the Orange County Superior Court.

The coordination judge issued a preliminary trial conference order bifurcating the trial of the actions and designating a number of issues to be tried by the court separately and in advance of the other issues. The questions of de facto taking and the existence of public pathway and recreational easements over the property were tried first. At the conclusion of the first phase trial the court made numerous findings and conclusions favorable to the Tapers, including that there had been a de facto taking of the property as of November 30, 1976, and that City and the State were estopped from asserting public recreational or pathway easements over the property.

The second phase was a jury trial in the inverse action of the fair market value of the property. Pursuant to the court's determination that City and the State were estopped from asserting public recreational or pathway easements over the property, evidence of the existence of such easements and argument concerning the effect they would have on the value of the property was largely foreclosed. The jury returned a verdict of $2.9 million.

---

formal condemnation proceedings. No public entity shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property."

Violation of the foregoing statutory provisions does not give rise in and of itself to a separate cause of action or a right to damages not already legally recognized. (Gov. Code, § 7270; *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 958 [162 Cal.Rptr. 210], cert. den., 449 U.S. 901 [66 L.Ed.2d 131, 101 S.Ct. 271].)

[2]In their first amended and supplementary complaint, plaintiffs also included a count for specific enforcement of an alleged compromise agreement. That count was subsequently dismissed with prejudice at the request of plaintiffs.

[3]City named the State as a party defendant because the eminent domain action involved boundaries of sovereign tide and submerged lands granted to City in trust (see *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 473 [91 Cal.Rptr. 23, 476 P.2d 423]) and because the State might claim some other interest on account of the possible existence of public recreational or pathway easements.

On July 5, 1979, judgment was entered in the inverse action purporting to adjudicate that: (1) City had de facto acquired and inversely condemned the Taper property as of November 30, 1976, and on that date became the owner in fee simple; (2) the Tapers were entitled to just compensation in the amount of $2.9 million and costs; and (3) City was estopped from asserting or claiming any implied dedication or ownership of public recreational or pathway easements over the property. In two subsequent orders the court awarded plaintiffs prejudgment interest at the statutory rate, attorney fees of $600,000 and other costs of $120,310.51. City timely appealed from the judgment and, later, from the order for fees and costs as an order after judgment. (Code Civ. Proc., § 904.1, subd. (b).)

On June 15, 1979, judgment was entered in the direct action providing that City and the State were estopped from claiming implied dedication or ownership of public recreational or pathway easements over the property and that: "As to all remaining issues, the cause is dismissed with prejudice[;] entry of said dismissal to be stayed or abated until entry of final judgment in favor of Sydney Mark Taper and Barry Hugh Taper [in the inverse action] . . . and payment of all sums due pursuant to [that] final judgment . . . ."

On August 15, 1979, City filed a notice of appeal from the judgment in the direct action. Meanwhile on August 1, City had served notice of its abandonment of the direct action and on August 21, the Tapers moved the court for an order vacating the abandonment. The Tapers' motion was granted by a minute order dated September 24, 1979. On November 21, 1979, City petitioned this court for a writ of mandate to annul the order setting aside the abandonment. On February 20, 1980, the City's petition for mandate was denied without opinion. City's petition for hearing was denied March 20, 1980, by the California Supreme Court. No appeal was taken by City from the order setting aside its abandonment of the condemnation action.

### Contentions and Conclusions

On its appeal from the judgment in the inverse action City first contends the determination that its conduct constituted a de facto taking of the property is contrary to law and not supported by substantial evidence. Secondly, it contends that the court prejudicially erred in several evidentiary rulings in the valuation trial, particularly in excluding evidence of public recreational and pathway easements and their effect on

the property's value, which rulings stemmed from the court's earlier determination that City was estopped from asserting the existence of such easements. On its appeal from the order awarding attorney fees and costs in the inverse action City contends that the award is excessive and erroneously includes attorney fees for services in both the inverse action and the direct action.

On their appeals from the judgment in the direct action both City and State contend that the determination they are estopped from asserting the existence of public recreational and pathway easements is legally erroneous and unsupported by substantial evidence. In connection with its appeal from the judgment in the direct action City also urges that we review the order vacating its purported abandonment of the action, notwithstanding the fact that no appeal has been taken from that order.

We conclude that the determination that City and State are estopped from asserting the existence of public pathways and recreational easements is unsupported by the evidence and legally erroneous and that therefore the exclusion of evidence of their existence and their effect on value was also erroneous. We further conclude that while substantial evidence supports the trial court's finding of a taking or at least of a compensable damaging, there is no substantial evidence to support the determination that the taking was of the fee. Thus, reversal of both judgments is required. However, we also conclude that the order vacating City's purported abandonment of the condemnation action was appealable as an order after judgment and, not having been appealed, has become final. In view of these determinations, we conclude finally that when jurisdiction is restored to the trial court, the direct action should proceed and that plaintiffs may obtain in that action any relief warranted by the court's determination that City engaged in unreasonable precondemnation conduct.

*Facts*

The property in question consists of approximately 3.5 acres of unimproved and unoccupied oceanfront land in the City of Long Beach. The bulk of the property lies at street level atop a shoreline bluff (this portion is referred to as the upland property); the remainder consists of sandy beach frontage at the base of the bluff (this portion is referred to as the beach property). The western edge of the upland property is bordered by a city park. The property was, and at all times through the

time of trial remained, zoned multiple residential (R-4) with no height or density limitation.

After acquiring the property in 1961, Barry Hugh Taper discovered that the beach property was subject to an easement for street purposes granted the City in 1929 by The Alamitos Land Company, one of Taper's predecessors in interest. The easement which was never formally utilized by the City was granted "for street purposes only" and was subject to reversion if not so used. In November 1961 The Alamitos Land Company quitclaimed its reversionary interest to Taper. Taper then submitted an application to the city council to vacate the street easement, and the application was granted.

In 1963, Taper and City entered into a written agreement (hereafter referred to as the 1963 Agreement), apparently with the intent to settle the status of title to the fee and mineral rights in the beach property. The agreement provided that Taper would release and quitclaim all interest in the beach property to City and that, upon acceptance of Taper's quitclaim deed, the City would in turn quitclaim back to Taper its interest in the beach property reserving and excepting all rights to drill, explore and produce oil, gas, hydrocarbon substances and minerals lying more than 200 feet below the surface of the land. The agreement further provided that the entire property would be developed in accordance with a plan attached to the agreement or a similar plan of development "acceptable to and [which has] received the prior written approval of the City Manager of the City of Long Beach." The latter provision was made expressly for the benefit of the City and was made binding on Taper, his successors and assigns as a covenant running with the land for a period of 25 years.

In 1968, Taper, City and the State of California acting by and through the State Lands Commission entered into an agreement (hereafter referred to as the 1968 Agreement) establishing a common boundary line between the state tidelands held in trust by City, and the adjoining beach property. The parties mutually agreed that the boundary line was as described in chapter 138 of the California Statutes of 1964, that "neither the State nor the City shall have any right, title or interest whatsoever ... except as to certain subsurface oil and gas rights ..." in the property lying north of the boundary line and that "Taper shall have no right, title or interest whatsoever" in property lying south of the boundary line.

In 1972, Taper entered into an agreement and escrow with Regency Towers, Inc., a developer, for sale of the property at a price of $1,465,000 plus $7,500 for every 30 days of delay. In December, an application was submitted to the city planning commission in the name of Regency Towers, Inc. for a special permit to construct a 324-unit condominium complex. In March 1973 the permit application was granted by the planning commission, sparking a citizens' appeal to the city council. Various letters and petitions were sent to elected city officials urging the City to acquire the Taper property for a public park.

On April 3, 1973, the day on which the city council was scheduled to hear the citizens' appeal, Regency Towers withdrew its application, mooting the appeal. Nevertheless, the city council proceeded to hear the matter and, after much discussion and debate, overruled the planning commission and denied the special permit on the ground that the City wished to preserve the property in its unimproved state pending the possibility of its acquiring the property for a park.

From 1973 through 1976, there was continued public pressure for the City to acquire the Taper property. Long Beach residents advertised in local newspapers the names of hundreds of residents urging the City's acquisition of the Taper property. Petitions were circulated containing the names of thousands of residents in favor of the acquisition. Planning studies and reports prepared by the City's planning department as well as by a private consulting firm recommended that the Taper property be used for a park. The Long Beach District Board of Realtors unanimously approved the planning department's report and urged the City to take immediate steps to purchase the property or to allow it to be developed in accordance with the existing zoning laws. The city manager of Long Beach, the official named in the 1963 agreement as the one who must be satisfied and give approval to any plan of development other than that attached to the agreement, made statements on several occasions during this period indicating that the City would not permit any development on the property and intended to acquire the property for use as a public park.

In July 1974, Barry Hugh Taper, having lost the sale to Regency Towers and frustrated by persistent opposition to development, sold the property for $1,718,000 to his father, Sydney Mark Taper, as trustee of the Barry Hugh Taper Trust.

Between July and November 1974, the City successfully applied for a state grant of $1,128,489 to purchase the Taper property for a park under the State Beach, Park, Recreation and Historical Facility Bond Act of 1974. In November, a local measure authorizing the transfer of $255,000 from a 1922 incinerator municipal bond fund for purchase of the property was submitted to the voters and overwhelmingly approved. By the end of 1975 City had the funds or access to the funds needed to purchase the property.

In February 1975, Taper was informed by the City that the property would be best used as an extension of the adjoining city park and that it had made two appraisals of the property. In May, following negotiations over a period of several months, City made a written offer to purchase the property for $1.75 million. Taper rejected the offer and made a counteroffer to sell for $1.9 million, whereupon the city council after an executive session directed the city attorney to get an alternative appraisal of the property that would take into account the existence of public recreational easements over portions of the property. The city attorney did so and by letter dated November 17, 1975, City rejected Taper's counteroffer and reduced its offer to $1.349 million.

In a letter to City, dated April 13, 1976, Taper's attorney stated: "Since it is obvious that no agreement can be reached upon the acquisition price, we request that the City take immediate steps to acquire the property by eminent domain .... The question of whether any of the property has been dedicated to a public use can be decided by the court as a preliminary legal issue in the eminent domain proceedings."

On May 4, City responded that it did not intend to take the property by condemnation but would acquire the property by purchase "if a mutually agreeable price could be arrived at...." As negotiations continued, it became apparent that City intended to acquire the property for a park but felt that acquisition by eminent domain might prove too costly; and although it would not permit any development City stated it would not condemn the property "as long as [City and Taper] negotiated."

In the following months, Taper and City reached virtual agreement except as to the question of whether or not there were public easements over the property. They in fact discussed the possibility of eminent domain but "without having a full blown condemnation action." It was

tentatively agreed to stipulate to a nonjury trial, to stipulate to the value of the property as $1.5 million encumbered with easements or $2 million unencumbered, and have the court determine whether or not there were easements. City would advance Taper $1.5 million prior to litigation in exchange for immediate possession of the property.

In September 1976, the State entered the picture, asserting the possible existence of an additional public easement on the upland property. In November, City learned that the property had a "naturally eroding bluff," that the South Coast Regional Coastal Commission would not permit development directly on the bluff and would require a 25-foot setback for development. City then proposed that the immediate cash advance under the stipulated nonjury trial arrangement be reduced from $1.5 to $1.1 million. At a meeting on November 30, 1976, the Tapers agreed in writing to the reduced figure, but City failed to sign. Thereafter at least one City official suggested that the price the City should pay for the property should be the amount at which it was appraised for the assessment of property taxes.

In an "attorney-client" meeting in 1976 the city council directed the city attorney to proceed to file a condemnation action, but it was not until July 19, 1977, that the city council passed a formal resolution authorizing the institution of such an action, and it was not until August 9, 1977, that the complaint in eminent domain was filed.

The findings of the trial court essentially set forth the foregoing facts and read in pertinent part as follows:

"12. In sustaining the citizens' appeal and overruling the Planning Commission grant of a Special Permit [on April 3, 1973], the members of the City Council were motivated by the desire and intent to preserve the Taper property in an unimproved state pending acquisition by the City as a park.

"13. The Planning Department of the City of Long Beach in September 1973, issued an Environmental Impact Report on the Regency Towers, Inc. proposed development of the Taper property which report recommended acquisition of the Taper property for use as a public park.

". . . . . . . . . . . . . . . .

"17. The City at all times intended to acquire the Taper property for park purposes and in July 1974, pursuing this goal, approved an application and did apply for a State Grant of $1,128,489.00, to use toward the acquisition of the Taper property, under the State Beach, Park, Recreation and Historical Facilities Bond Act of 1974.

". . . . . . . . . . . . . . .

"21. At the end of 1975, the City Manager of Long Beach, John Mansell, in a direct conversation with the Tapers' legal counsel, George Hart, stated the City's position to be that in no way would the City allow Taper to develop his property due to the great public pressure for acquisition.

"22. At the end of 1975, the City of Long Beach had funds or access to funds with which to purchase the Taper property.

". . . . . . . . . . . . . . .

"30. Despite written demand made on or about April 13, 1976, by Taper that the City immediately file condemnation proceedings for the acquisition of the Taper property, the City of Long Beach failed and refused, until in or about August 1977, to commence proceedings in eminent domain for the acquisition of the Taper property, thereby making it necessary for the Tapers to institute legal proceedings, in February 1977, to prove the fact of the taking of their property.

". . . . . . . . . . . . . . .

"32. The City of Long Beach did actually intend to acquire the Taper property and did have appraisals prepared in 1975 for the acquisition of the Taper property, however, the City did unreasonably delay in the filing of condemnation proceedings to August 1977.

". . . . . . . . . . . . . . .

"39. From in and after April 1973, the Taper property was unmarketable, unsaleable and unusable due to widely and publicly disseminated pre-condemnation announcements and activities by the City of Long Beach wherein the City of Long Beach made known its intent and desire to acquire the Taper property for use as a park.

"40. The conduct of the City of Long Beach has caused the owners of the Taper property to be denied all use and enjoyment of said property and the right to sell, develop or improve it.

". . . . . . . . . . . . . . .

"45. The City of Long Beach did breach the statutory duties imposed by Government Code Section 7267.5 by deferring negotiations.

"46. The City of Long Beach did breach the statutory duties imposed by Government Code Section 7267.5 by deferring condemnation and the deposit of funds in court for the use of the Tapers.

"47. The City of Long Beach did breach the statutory duties imposed by Government Code Section 7267.5 by taking action coercive in nature in order to compel an agreement on the price to be paid for the Taper property.

"48. The City of Long Beach did breach the statutory duties imposed by Government Code Section 7267.6 by intentionally making it necessary for the Tapers as owners to institute legal proceedings to prove the fact of the taking of the Taper property."

The court's conclusion of law numbered 3 reads: "The conduct of the City of Long Beach toward the owners of the Taper property has been unreasonable and oppressive and has resulted in a legal restraint of the use of the Taper property so as to constitute a taking of said property under Article 1, Section 19 of the Constitution of the State of California."

*Discussion*

At the time this case was tried there was, and there still is, some uncertainty as to the parameters of and the prerequisites to liability of public entities for unreasonable delay in exercising the right of eminent domain or other oppressive "precondemnation" conduct as announced in *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]. (See *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332, 354-355 [153 Cal.Rptr. 895]; also compare *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10

Cal.3d 110, 119 [109 Cal.Rptr. 799, 514 P.2d 111],[4] with *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 517, fn. 14 [125 Cal.Rptr. 365, 542 P.2d 237],[5] and compare both with *Jones v. People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144, 151 [148 Cal.Rptr. 640, 583 P.2d 165].[6]) Although neither the court nor counsel for the parties may properly be faulted for their decision, therefore, the decision to try the inverse action before the direct action was nevertheless responsible for a good many of the difficulties involved in this appeal. ■ The underlying consideration in an inverse condemnation action is the proper balance between the owner's private property rights and the public need for proper land use and fiscal planning and control. (See *Agins v. Tiburon* (1980) 447 U.S. 255, 260-261 [65 L.Ed.2d 106, 112, 100 S.Ct. 2138]; *Agins v. City of Tiburon* (1979) 24 Cal.3d 266, 275-276 [157 Cal.Rptr. 372, 598 P.2d 25]; *Selby Realty Co. v. City of San Buenaventura, supra,* 10 Cal.3d at pp. 120-121; *Klopping v. City of Whittier, supra,* 8 Cal.3d at p. 45, fn. 1.) By contrast, in an eminent domain action, the public entity has already planned and decided to acquire the property and has instituted proceedings to do so, and the principal question is how much the property owner should have as "just compensation." (See *Klopping v. City of Whittier, supra,* 8 Cal.3d at p. 43.) Moreover, in respect to a claim for damages from unreasonable "precondemnation" conduct whether or not eminent domain proceedings have been instituted and whether or not they remain pending are important considerations. (See *Klopping v. City of Whittier, supra,* 8 Cal.3d at p. 58; *People* ex rel. *Dept. Pub. Wks. v. Peninsula Enterprises, Inc.,*

---

[4]The court there stated: "We held [in *Klopping*] that if the city had acted unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain proceedings or by other oppressive conduct, the owner was entitled *to maintain an action in inverse condemnation.*" (Italics added.)

[5]The court there stated: "We held [in *Klopping*] only that the plaintiff should be able *to include in his eminent domain damages* the decline in value attributable to this unreasonable precondemnation action by the city. The case thus *in no way resembles* the instant one, in which plaintiffs make no allegations that the city intends to condemn the tract in question." (Italics added.)

[6]The court there declined to decide whether "an announcement of intent to condemn is essential for the application of the *Klopping* rationale" but nevertheless essentially affirmed a judgment awarding damages for diminution in value of property resulting from the state's planning a freeway, later abandoned, and entering into an agreement with the County of Sacramento which had the effect of making it appear that the property would not have the access needed for approval as a subdivision. (*Jones, supra,* 22 Cal.3d at pp. 151-152.) In characterizing *Klopping* the court stated: "We held [in *Klopping*] that *a cause of action for inverse condemnation* was stated by allegations that a diminution in market value resulted from 'unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation ....' [Citation.]" (*Id.,* at p. 151, italics added.)

*supra*, 91 Cal.App.3d at p. 353; *Richmond Redevelopment Agency* v. *Western Title Guaranty Co.* (1975) 48 Cal.App.3d 343, 351 [122 Cal.Rptr. 434]; *People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co.* (1973) 33 Cal.App.3d 960, 965-966 [109 Cal.Rptr. 525].) It is therefore a matter of significance in this appeal whether or not the direct action is still extant, and we undertake to resolve that question by first addressing the judgment in the direct action.

*Appealability of the Direct Action Judgment*

█ Except as specifically otherwise provided by statute, only final judgments are appealable (*Knodel* v. *Knodel* (1975) 14 Cal.3d 752, 760 [122 Cal.Rptr. 521, 537 P.2d 353]; see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 36, pp. 4050-4051), and the initial question presented is whether the judgment entered in the direct action was a final judgment. Indeed, because of its bearing on the question of the appealability of the court's later order vacating City's abandonment of the direct action, this question is probably the pivotal question on appeal.

Somewhat ironically, City and the Tapers, the parties most vitally affected, have switched positions on this issue in the course of the appeal. Originally City, having appealed from the judgment, maintained it was appealable. The Tapers originally urged the judgment was not a final judgment because it purported to adjudicate only the estoppel issue and otherwise dismissed the action but provided that "entry of said dismissal to [be] stayed or abated until entry of final judgment in favor of Sydney Mark Taper and Barry Hugh Taper [in the inverse action] . . . and payment of all sums due pursuant to [that] final judgment . . . ." Thus, it was argued, the judgment was not final because further proceedings were possible. In response to questions from the court about the appealability of the order vacating the City's abandonment of the action, however, the Tapers now urge that the judgment was a final judgment and that the subsequent order vacating City's abandonment of the direct action was appealable as an order after a final judgment. (Code Civ. Proc., § 904.1, subd. (b).) City, although it is reluctant in face of the inconsistency, perforce must argue that the judgment was nonappealable.

█ City's original and the Tapers' belated position is correct. The judgment entered in the direct action was a final judgment. It provided: "As to all remaining issues, the cause *is* dismissed with prejudice . . . ." (Italics added.) The judgment was, of course, conditional, that is, it was

to be final only if the judgment in the inverse action became final and was satisfied. However, no further judicial act was required if the judgment in the inverse action became final and was paid. At most, only the ministerial act of entering a dismissal was contemplated in such event. The fact that a judgment is conditional does not prevent it from being a final, appealable judgment if, so far as the .condition is concerned, the order is self-executing and requires no further judicial act. (*Yarbrough* v. *Yarbrough* (1956) 144 Cal.App.2d 610, 613-614 [301 P.2d 426]; *Reeves* v. *Hutson* (1956) 144 Cal.App.2d 445, 450-451 [301 P.2d 264].)

*Reviewability of the Order Vacating City's Abandonment of the Direct Action.*

Inasmuch as the judgment entered in the direct action was a final, appealable judgment, the court's subsequent order setting aside City's abandonment of the action was also appealable as an order made after an appealable judgment. (Code Civ. Proc., § 904.1, subd. (b); cf. *Harth* v. *Ten Eyck* (1939) 12 Cal.2d 709, 710 [87 P.2d 693]; *Colby* v. *Pierce* (1936) 15 Cal.App.2d 723, 724-725 [59 P.2d 1046].) No appeal was taken from that order, and it is no longer reviewable on appeal. (*Levy* v. *Brill* (1951) 107 Cal.App.2d 204, 205 [236 P.2d 603].)

City's argument that, nevertheless, "[t]his [c]ourt has inherent jurisdiction to decide the abandonment issue" is misconceived and its reliance for that proposition on *Rosack* v. *Volvo of America Corp.* (Cal.App.), is misplaced for two reasons. First, a rehearing was granted in *Rosack* June 26, 1981. Second, *Rosack* involved an appeal from an order denying certification of the class in a purported class action and dismissing the action as to the class. The court concluded that the order was *not a final judgment and therefore not appealable* but, nevertheless, reviewed the order by treating the appeal as a petition for writ of mandate (see *DeGrandchamp* v. *Texaco, Inc.* (1979) 100 Cal. App.3d 424, 437 [160 Cal.Rptr. 899], and cases there cited). Here, however, the order vacating City's abandonment of the action *was appealable* and was not appealed.

We are not aware of any authority for an appellate court to review an appealable order when no appeal was taken from the order and the time for appeal has passed. The timely taking of an appeal "is not

merely a procedural [matter]; it vests jurisdiction in the appellate court and terminates the jurisdiction of the lower court. And of particular importance is the fact that the security of rights of contract, titles to property, and the status of persons rest upon certainty in the finality of judgments occasioned by the lapse of the statutory time for the taking of an appeal." (*Estate of Hanley* (1943) 23 Cal.2d 120, 123-124 [142 P.2d 423, 149 A.L.R. 1250] italics added; accord: *Fawn* v. *Holiday Investment Corp.* (1978) 81 Cal.App.3d 582, 584 [146 Cal.Rptr. 512]; *Levy* v. *Brill, supra,* 107 Cal.App.2d at p. 205.) The right of appeal is wholly statutory, and when the statutory appeal period has passed without an appeal having been taken an appellate court of this state is without jurisdiction to review an order or judgment that was appealable. (*Id.*)

*Propriety of Judgment Estopping City and the State From Asserting Public Recreational and Pathway Easements*

■ We are at a bit of a loss to know precisely the basis for the court's determination that City and the State are estopped from asserting public recreational and pathway easements. The court did not make detailed findings on the issue of estoppel, notwithstanding a request by the State. All parties appear to agree that the finding of estoppel was based on the 1963 Agreement between Barry Hugh Taper and City and the 1968 Agreement between Taper, City and the State. The Tapers attempt to justify the court's determination on principles of equitable estoppel. But the evidence does not support a determination of equitable estoppel; the determination is also contrary to law.

"'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.'" (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 489, quoting *Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].) Even assuming that in entering into the 1963 and 1968 Agreements one or both of the governmental entities acted in some way that gave the Tapers a right to believe the conduct was intended to be relied on in respect to public recreational easements and pathways (a doubtful proposition), there is no substantial evidence

that in 1963 or 1968 either of the public entities had knowledge of the allegedly true facts, that public recreational or pathway easements existed. The landmark decision governing the implied dedication of public recreational and pathway easements is *Gion* v. *City of Santa Cruz* (1970) 2 Cal.3d 29 [84 Cal.Rptr. 162, 465 P.2d 50] (sometimes referred to as *Gion-Dietz*), and that decision was not rendered until February 1970.

Additionally, the court in *Mansell* referred to a significant qualification on the rule that equitable estoppel may be applied against government entities: "[A]n estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public, . . .' [Citation.]" (*Mansell, supra,* 3 Cal.3d at p. 493; accord: *State of California* v. *Superior Court (Fogerty)* (1981) 29 Cal.3d 240, 244 [172 Cal.Rptr. 713, 625 P.2d 256]; *County of Los Angeles* 'v. *Berk* (1980) 26 Cal.3d 201, 222 [161 Cal.Rptr. 742, 605 P.2d 381], cert. den. 449 U.S. 836 [66 L.Ed.2d 43, 101 S.Ct. 111].) The words of the court in the *Berk* case are wholly apposite to the case at bench: "Even if the elements of estoppel here appeared—which as we have indicated they do not—this is not a case in which an estoppel could properly be raised against the government and the people to defeat a claim of public recreational easement. It is well established that an estoppel will not be raised against such parties when to do so would nullify 'a strong rule of policy, adopted for the benefit of the public, . . .' [Citations.] As we pointed out in *Gion-Dietz*, there is a clearly enunciated public policy in this state in favor of allowing public access to shoreline areas. [Citation.] To allow the raising of an estoppel to defeat the claim of public right here involved would be manifestly contrary to this policy." (*Berk,* 26 Cal.3d at p. 222, fn. omitted.)

It is suggested that the estoppel finding may have been based upon the trial court's interpretation of the 1963 Agreement and the quitclaim deeds exchanged as having given the Tapers an absolute right for a period of 25 years to develop the property in accordance with the plan attached to the agreement or a similar plan meeting the approval of the city manager, regardless of any existing or future public recreational or pathway easements. If in fact that was the court's theory, the determination is nevertheless erroneous. In the first place, the State was not a party to the 1963 Agreement and could not be estopped thereby from asserting public recreational or pathway easements. Secondly, if City were said to be the proper representative of the public in respect to any public easements and pathways that might have then existed, suffice it

to say that in entering into the 1963 Agreement and the exchange of quitclaim deeds, the City was acting in its proprietary capacity as the owner of gas and oil rights, not in the capacity as trustee for the public with respect to public recreational and pathway easements.

Finally, in truth, neither the 1963 nor 1968 Agreement had anything to do with public recreational or pathway easements. The principal purpose of the 1963 Agreement was to clear up title problems relating to the fee to the beach property and oil and gas rights; the purpose of the 1968 Agreement was to fix the boundary line between the state tidelands held in trust by City and the adjoining beach property. In *City of Long Beach* v. *Daugherty* (1977) 75 Cal.App.3d 972 [142 Cal.Rptr. 593], (cert. den. (1978) 439 U.S. 823 [58 L.Ed.2d 116, 99 S.Ct. 91]), which considered the effects upon the existence of public recreational easements of agreements and a court decision purporting to settle the boundary line between the city-owned submerged tidelands and privately owned property, the court stated: "Nothing in the agreements or the decision is directed to the existence of any easements over any of the land therein involved. Nor was there any need, in view of the purpose of the agreements involved, to consider any issue as to easements. Ownership of an easement has no necessary relationship to ownership of a fee title." (*Id.*, at p. 977.)

We conclude that the trial court's determination on the issue of estoppel was in error, with the result that its excluding evidence and argument as to the existence of public recreational and pathway easements and their effect on market value was also erroneous. It is probable that had such evidence and argument been permitted the outcome in the valuation trial would have been more favorable to City. Accordingly, the judgment in the direct action and the judgment in the inverse action, at least as to the amount of the judgment, must be reversed. We turn next to a determination as to whether the judgment in the inverse action is sustainable in part.

*Is the Finding of a De Facto Taking of the Fee Contrary to Law or Unsupported by Substantial Evidence?*

Having concluded that the judgment in the inverse case must be reversed, at least as to the amount of damages, and having also concluded that the court's vacating City's abandonment of the direct action is now final and unreviewable, it probably makes little practical difference whether or not the court's finding that the fee was de facto taken is af-

firmed or reversed. If it was not de facto taken it will be taken in eminent domain and in either case the real question remaining is the amount of compensation due the Tapers. Nevertheless, the theoretical legal problem confronts us and cannot be avoided.

 Our conclusion is that the trial court's findings that City intended to acquire the property for a public park and that by unreasonable delay in commencing proceedings in eminent domain and other unreasonable precondemnation conduct City denied the Tapers "all use and enjoyment of said property and the right to sell, develop or improve it" accord with law and are fully supported by the evidence. We are unable to agree, however, with the court's conclusion that this resulted in a de facto taking of the fee, because we find in the record no substantial evidence that City's conduct deprived the Tapers of the use or enjoyment or the right to sell, develop or improve the property for so long a time that it should be considered permanent.

There was a taking all right or at least a compensable damaging, but of what? The evidence establishes that what was taken or compensably damaged was the use and enjoyment of the property and the right to develop or improve it and therefore, in practical effect, the right to sell it, all for a period of, perhaps, several years after a reasonable time had passed for City to do its planning and either purchase the property or commence proceedings in eminent domain. For this taking or damaging, which resulted from City's unreasonable delay and other oppressive precondemnation conduct, the Tapers are entitled to recover damages for any diminution in the market value of the property attributable to City's unreasonable conduct, which diminution in value may, of course, be measured by the loss of the reasonable value of the use of the property. (Cal. Const., art. I, § 19;[7] *Jones* v. *People* ex rel. *Dept. of Transportation, supra*, 22 Cal.3d at pp. 154-156; *Klopping* v. *City of Whittier, supra*, 8 Cal.3d at pp. 45-46; *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc., supra*, 91 Cal.App.3d at p. 349; *Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987, 993-994 [124 Cal.Rptr. 822].) Inasmuch as the direct action is to proceed, such damages are recoverable, indeed the cases indicate they must be recovered, in the direct action. (See *Klopping* v. *City of Whittier, supra*, 8 Cal.3d at p. 58; *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc., su-*

---

[7]California Constitution, article I, section 19, provides in pertinent part: "Private property may be taken or damaged for public use only when just compensation ... has first been paid ...."

*pra*, 91 Cal.App.3d at p. 353; *Richmond Redevelopment Agency* v. *Western Title Guaranty Co., supra*, 48 Cal.App.3d at pp. 350-351; *People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co., supra*, 33 Cal.App.3d at pp. 965-966.)

City contends that the decisions in *Agins* v. *City of Tiburon, supra*, 24 Cal.3d 266, *Toso* v. *City of Santa Barbara, supra*, 101 Cal.App.3d 934, and *Briggs* v. *State of California* ex rel. *Dept. Parks & Recreation* (1979) 98 Cal.App.3d 190 [159 Cal.Rptr. 390], (cert. den. (1980) 447 U.S. 917 [65 L.Ed.2d 1109, 100 S.Ct. 3005]), establish that the court's determination of de facto taking is contrary to law and require full reversal of the judgment in the inverse action, presumably with directions to enter judgment in its favor. Not so. *Agins* involved a down zoning of property that, according to the owners' allegations, deprived them of all economic use of the property. The California Supreme Court held that the owner's proper remedy was an action to invalidate the rezoning ordinance, not an action for damages in inverse condemnation. (*Agins, supra*, 24 Cal.3d at pp. 276-277, 278; cf. *Agins* v. *Tiburon, supra*, 447 U.S. at p. 263 [65 L.Ed.2d at pp. 113-114, 100 S.Ct. 2138].[8]) Rejecting a recovery of damages under *Klopping*, the court stated: "*Klopping* involved a plaintiff's recovery for the decline in market value as the result of an unreasonable delay in the institution of eminent domain proceedings following announcement of intent to condemn, and other unreasonable conduct prior to condemnation. In the matter before us there was no such delay or conduct." (*Agins, supra*, 24 Cal.3d at p. 278.) *Agins* has little to do with this case.

In *Briggs* the trial court had made no findings concerning unreasonable precondemnation activity (*Briggs, supra*, 98 Cal.App.3d at p. 206), and on appeal the court, quoting extensively from *Selby Realty Co.* v.

---

[8]In its opinion the United States Supreme Court stated in pertinent part: "The California Supreme Court rejected the appellants' characterization of the issue by holding, as a matter of state law, that the terms of the challenged ordinance allow the appellants to construct between one and five residences on their property.... Because the appellants have not submitted a plan for development of their property as the ordinances permit, there is as yet no concrete controversy regarding the application of the specific zoning provisions. [Citations.]" (*Agins, supra*, 447 U.S. at p. 260 [65 L.Ed.2d at p. 111, 100 S.Ct. 2138].) Thereafter the high court concluded: "The State Supreme Court determined that the appellants could not recover damages for inverse condemnation even if the zoning ordinances constituted a taking. The court stated that only mandamus and declaratory judgments are remedies available to such a landowner. Because no taking has occurred, we need not consider whether a State may limit the remedies available to a person whose land has been taken without just compensation." (*Id.*, at p. 263 [65 L.Ed.2d at pp. 113-114, 100 S.Ct. 2138].)

*City of San Buenaventura, supra,* 10 Cal.3d 110, held that the actions by the public authorities there involved constituted no more than reasonable land use and fiscal planning (*Briggs, supra,* 98 Cal.App.3d at pp. 203-207).

It is, of course, true that general land use planning, feasibility studies and even the adoption of a general plan indicating potential use of privately owned property does not amount to inverse condemnation. (*Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d at p. 119; *Rancho La Costa* v. *County of San Diego* (1980) 111 Cal.App.3d 54, 60-61 [168 Cal.Rptr. 491], cert. den. (1981) 451 U.S. 939 [68 L.Ed.2d 326, 101 S.Ct. 2020]; *Briggs* v. *State of California* ex rel. *Dept. Parks & Recreation, supra,* 98 Cal.App.3d at pp. 203-207.) Undoubtedly, good faith negotiation by a municipality for the purchase of private property over a period of time reasonable in the circumstances would likewise not give rise to a cause of action for inverse condemnation. Nor does calling a bond election and urging passage for the purpose of securing funds for the acquisition of private property in appropriate circumstances amount to unreasonable conduct giving rise to a cause of action in inverse condemnation. (*Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d at pp. 952-953; *Briggs* v. *State of California* ex rel. *Dept. Parks & Recreation, supra,* 98 Cal.App.3d at p. 207; *City of Walnut Creek* v. *Leadership Housing Systems, Inc.* (1977) 73 Cal. App.3d 611, 621-623 [140 Cal.Rptr. 690].) The same is true in the absence of official action to acquire private property when there is merely public discussion, debate and statements advocating public acquisition of a property. (*Toso* v. *City of Santa Barbara, supra,* 101 Cal.App.3d at p. 953.) On the other hand, however, public agencies are statutorily admonished not to "defer negotiations or condemnation . . . or take any other action coercive in nature, in order to compel an agreement on the price to be paid for . . . property" (Gov. Code, § 7267.5 [see fn. 1, *ante*]) or "intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property" (Gov. Code, § 7267.6 [see fn. 1, *ante*]).

While the *Toso* decision did involve some factual similarities to the case at bench, it, too, is fundamentally distinguishable. Like *Agins* and *Selby, Toso* was a zoning and general planning case. The principal conduct complained of was the refusal of the City of Santa Barbara to grant a zoning change from residential to RH (resort hotel). In a paragraph of the opinion that appears to summarize its conclusions, the

court stated: "In the case at bench there was no resolution of condemnation, there was no announcement of intent to condemn, *nor was there any official act by the city towards acquiring the property.* While an absence of a formal resolution of condemnation is not crucial, there must be some official act or official expression of intent to acquire. In the case at bench there were public meetings, negotiations, planning, debates and an advisory ballot proposition calling for acquisition but there was no official act done by the city towards acquiring the property. *We have here no more than general planning that is noncompensable.* Absent either a formal resolution of condemnation or some other official action towards the acquisition of plaintiff's property, there can be no cause of action in inverse condemnation." (*Toso, supra*, 101 Cal.App.3d at p. 957; orig. italics deleted; italics added.)

The *Toso* court recognized that no formal resolution of condemnation is required as a prerequisite to recovery under *Klopping*, but only "some official act or official expression of intent to acquire" the property. (*Toso, supra*, 101 Cal.App.3d at p. 957; accord: *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc., supra*, 91 Cal.App.3d at p. 356.) However, an official expression of intention to acquire the property by the public authority is certainly an important factor in determining whether or not there has been a taking. (See *Rancho La Costa* v. *County of San Diego, supra*, 111 Cal.App.3d at p. 62; *Toso* v. *City of Santa Barbara, supra*, 101 Cal.App.3d at pp. 956-957.)

In the case at bench City's conduct went well beyond general land use planning and negotiation. There was an "attorney-client" meeting in which the city council authorized the city attorney to institute eminent domain proceedings, and ultimately a formal resolution of condemnation was adopted and an action in eminent domain was instituted and is pending. In addition, the court found on substantial evidence that City intended to acquire the property and, of course, there was unimpeached testimony that the city manager, the official named in the 1963 agreement as having the power to approve a plan of development, stated on several occasions that City intended to acquire the property and would not permit its development. Further, City in fact entered into negotiations for acquisition of the property and made several written offers to purchase it.

Thus, having expressed its intention to acquire the property and having raised the funds necessary to do so, City, as found by the trial court

on substantial evidence, unreasonably dragged out the negotiations, progressively reducing its offers, and unreasonably delayed in commencing an eminent domain action. At the same time City would not permit plaintiffs to develop and utilize the property, notwithstanding the fact that City had entered into a written agreement with Barry Hugh Taper in 1963 that would have permitted such development.

The facts here are reminiscent of those relied on by the court in *People* ex rel. *Dept. Pub. Wks. v. Peninsula Enterprises, Inc., supra*, 91 Cal.App.3d at page 356, in concluding that damages in inverse condemnation were proper: "Here, the evidence showed that condemner's activities had gone beyond the point of general planning .... Indeed, an agent of condemner approached owners as early as January 1969 regarding possible acquisition of their property, at which time owners were informed the acquisition would take place within a year.... Perhaps most significant is the fact that condemner's agent made an offer on May 21, 1970, to purchase the required portion .... Most certainly, an offer to purchase would not have been made in May 1970 had condemner not at that point already made a determination that a portion of the subject property would be needed for freeway purposes. Granted, the trial court did not view any of these early activities as in themselves placing a duty upon condemner to move quickly toward condemnation. Their occurrence, however, no doubt permitted the court to conclude that by the time of the October 30, 1970, freeway agreement, condemner's activities had reached the acquiring rather than planning stage and that the freeway agreement in question should therefore be treated as the type of precondemnation announcement resulting in direct and special interference with private property with which the court in *Klopping* was concerned."

■ There is no merit in City's contention apparently made for the first time on appeal that plaintiffs are foreclosed from asserting inverse condemnation because they failed to exhaust their administrative remedies by seeking a permit to develop the property (see *Frisco Land & Mining Co. v. State of California* (1977) 74 Cal.App.3d 736 [141 Cal.Rptr. 820].) In 1972 application was made for development of the property, and, although the planning commission approved the application, the city council rejected it because of the public demand that City acquire the property for a public park. The trial court found that plaintiffs were "denied all use and enjoyment of [the] property and the right to sell, develop or improve it." Implicit in that finding is a determina-

tion that it would have been futile for plaintiffs to have again sought a permit to develop the property, and that implied finding is overwhelmingly supported by the evidence. The doctrine of exhaustion of administrative remedies does not apply when it is established that an attempt to exhaust such remedies would have been futile. That is recognized by the very case upon which City relies. (*Id.*, at p. 756.)

■ Relying on a passage from *Klopping*, City contends there can be no de facto taking in the absence of a "physical invasion or direct legal restraint." This may be more a problem of semantics than substance. It is certainly true that in *Klopping* the court stated: "The prevailing rule [in de facto taking cases] ... is that before a de facto taking results there must be a 'physical invasion or direct legal restraint ....' [Citation.]" (*Klopping, supra*, 8 Cal.3d at p. 46.) However, City appears to labor under a misapprehension as to what constitutes a "direct legal restraint" within the meaning of the rule referred to in *Klopping*. That phrase refers to "an invasion or an appropriation of some valuable property right which the landowner possesses and [which] ... directly and specially affect[s] the landowner to his injury." (*Selby Realty Co.* v. *City of San Buenaventura, supra*, 10 Cal.3d at pp. 119-120; accord: *Jones* v. *People* ex rel. *Dept. of Transportation, supra*, 22 Cal.3d at pp. 151-152; *Rancho La Costa* v. *County of San Diego, supra*, 111 Cal.App.3d at p. 60; *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc., supra*, 91 Cal.App.3d at pp. 355-356.) In the case at bench the trial court found on substantial evidence, as previously observed, that City intended to acquire the property for a public park, would not permit any development of it, and completely deprived the Tapers of the right to use or develop the property for an unreasonable period of time. There can be no question but that City's actions "directly and specially affect[ed]" the Tapers' to their injury. (Cf. *Jones* v. *People* ex rel. *Dept. of Transportation, supra*, 22 Cal.3d at p. 152; *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc., supra*, 91 Cal.App.3d at p. 356; *Stone* v. *City of Los Angeles, supra*, 51 Cal.App.3d at pp. 992-993.)

■ The trial court did not in its findings indicate the exact duration of the delay it found to be unreasonable, although some inferences might be drawn from its fixing the date of de facto taking as November 30, 1976. The trial court will be directed when jurisdiction is restored to it to make a finding fixing the period during which City unreasonably delayed and engaged in other oppressive precondemnation conduct as

already found. In so doing, however, there must be deducted from the whole period of delay a reasonable period for proper land use and fiscal planning, and we are not persuaded that the period during which the Tapers were deprived of the right to use or develop the property was so protracted that it can be considered permanent and result in a conclusion that the property was taken in fee. The only somewhat analogous case to which reference has been made in which it was held the property was taken in fee is *Peacock* v. *County of Sacramento* (1969) 271 Cal.App.2d 845, 856-858, 861-862, 863-864 [77 Cal.Rptr. 391]. But in *Peacock* the actions of the public authority were considerably more egregious than in the case at bench, and the property owner was deprived of all meaningful use of his property for a period of some 10 years (see Note, *Eldridge* v. *City of Palo Alto: Aberration or New Direction in Land Use Law*? (1977) 28 Hastings L.J. 1569, 1596.) The facts of *Peacock* were referred to by the *Peacock* court itself as "exceptional." (*Peacock, supra*, 271 Cal.App.2d at p. 864.) We are persuaded that the taking or damaging effected by the unreasonable precondemnation conduct of City as found by the court in this case was of the Tapers' right to utilize the property for an unreasonable period of time to be more specifically determined when jurisdiction is restored to the trial court. (Cf. *Jones* v. *People* ex rel. *Dept. of Transportation, supra*, 22 Cal.3d at pp. 154-156; *People* ex rel. *Dept. Pub. Wks.* v. *Peninsula Enterprises, Inc., supra*, 91 Cal.App.3d at pp. 356-359.)

Other issues raised will not necessarily recur in further proceedings and need not be resolved.

*Disposition*

In the direct action the judgment is reversed. In the inverse action the judgment is reversed except insofar as it determines that City did engage in unreasonable delay and other oppressive precondemnation conduct, in which respect it is affirmed. Upon restoration of jurisdiction to the trial court it is directed to make a finding based on the evidence already adduced determining the period during which the Tapers were unreasonably denied the right to develop and utilize the property. Thereafter, trial shall proceed in the direct action in which the trier of fact shall, in addition to all other issues, determine and award to the Tapers the amount of damages, if any, resulting from City's unreasonable delay and other oppressive precondemnation conduct.

Because we are reversing the inverse action judgment determining that the fee had bee taken and because the recovery of attorney fees in an inverse condemnation action is dependent upon a judgement for damages in favor of the plantiff (Code Civ. Proc., §1036), the trial court's order awarding the Tapers litigation expenses must also be reversed. It is so ordered.

The question whether a litigant who recovers "Klopping damages" is entitled to recover litigation expenses under Code of Civil Procedure section 1036 is not ripe for decision, for as yet the Tapers have not proven recoverable "Klopping damages." However, our reversal of the order for litigation expenses is without prejudice to a determination of the question in the trial court.

We would but are unable to award litigation expenses on appeal because, although the appeal involved both the inverse and direct actions, the right to recover litigation expenses has not yet been established in the trial court in either case. However, our failure to make such an award on appeal is without prejudice to future determination in the trial court of the right to litigation expenses in either action. And if the right is ultimately established in either or both actions, the Tapers shall recover their reasonable litigation expenses on appeal in respect to the action or actions in which the right is established.

The Tapers shall recover costs on appeal.

Morris, Acting P. J., and Tamura, J.,* concurred.

Petitions for a rehearing were denied April 1, 1982, and the judgment was modified to read as printed above. The petition of appellant City of Long Beach for a hearing by the Supreme Court was denied June 9, 1982.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.