[No. B225082. Second Dist., Div. Four. Apr. 12, 2011.]

CITY OF LOS ANGELES, Petitioner, v.
THE SUPERIOR COURT, Respondent;
PETER PLOTKIN et al., Real Parties in Interest.

## COUNSEL

Carmen A. Trutanich, City Attorney, Kerrin Tso and Michael S. Kaplan, Deputy City Attorneys, for Petitioner.

No appearance for Respondent.

Callanan, Rogers & Dzida and Joseph S. Dzida for Real Parties in Interest.

## OPINION

**MANELLA, J.**—Petitioner City of Los Angeles (the City) sought writ review of the trial court's grant of real parties in interest's motion for summary adjudication. The court found that the City's creation of "condemnation blight" obligated the City to pay compensation to real parties in interest in their action for inverse condemnation. To support their motion, real parties in interest, who own properties located near the Los Angeles International Airport (LAX), established that the City has been buying properties in their neighborhoods through voluntary acquisition, relocating the residents and demolishing the structures, leaving the land vacant. Real parties in interest did not, however, establish that the City had a plan to use the land acquired for a public purpose or that it intended to acquire their properties or any other properties in the area through condemnation. Accordingly, we conclude that real parties in interest failed to establish entitlement to summary adjudication on their inverse condemnation claim.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. *The Complaint*

In July 2009, real parties in interest Peter Plotkin, M&M Plotkin Enterprises, L.P., George Zayats, Jr., Genevieve Goldberg, G.P. Investment, the Peter & Masha Plotkin Memorial Foundation and Raymond R. Pablo brought suit against the City for "[i]nverse [c]ondemnation" and "[d]amages

due to [c]ondemnation [b]light." The complaint alleged that the City, acting by and through its Department of Airports (also known as Los Angeles World Airports or LAWA), announced an expansion plan for LAX into the nearby neighborhoods of Manchester Square and Belford where real parties in interest owned parcels of real property.[1] The complaint further alleged that the City had "gone beyond mere planning" and had acquired most of the properties in those areas. According to the complaint, after purchasing a property, the City's practice was to raze any structures on it, or vacate and fence it. With respect to some properties, the City first allowed the structures to be used for fire department practice or for the filming of special effects, such as explosions and fires. Real parties in interest contended that as a result of the City's activities, the value of their properties had diminished and that they had suffered a loss of rental income. Real parties in interest also contended that the City had "gained de facto control over [their] property," that it was "effectively the only buyer and market for the property," and that it was "squeezing [real parties in interest]" in order to "acquire [their] property on its own terms, on its own schedule and at its own convenience."

In the prayer, real parties in interest sought "damages in an amount according to proof" and "such other and further relief as the court deems just and proper," but did not seek to require the City to purchase their properties for fair market value.

### B. *Motion for Summary Adjudication*

#### 1. *Moving Papers*

Real parties in interest moved for summary adjudication. They identified the following two issues as ripe for resolution: (1) whether the City's creation of "condemnation blight" resulted in a duty to pay just compensation to real parties in interest; and (2) whether real parties in interest's inverse condemnation claim was barred by the statute of limitations.[2] To support summary adjudication of these issues, real parties in interest established, or endeavored to establish, the facts set forth in the following paragraphs.

---

[1] The Department of Airports is a proprietary department of the City governed by a seven-member Board of Airport Commissioners. The Department of Airports owns and operates LAX.

[2] Under Code of Civil Procedure section 437c, subdivision (f)(1), a party may move for summary adjudication as to "one or more affirmative defenses" or "one or more issues of duty."

At some point, the City began to acquire properties in the Manchester Square and Belford areas.[3] By the time this litigation commenced, the City had expended over $225 million acquiring Manchester Square properties and over $40 million acquiring Belford properties. By August 2008, it had acquired 72 percent of the multifamily dwellings in those areas; only 81 out of 286 remained in private hands. In addition, it had acquired 265 out of 279 single-family dwellings.

Prior to 2007, the City had demolished "a minority" of the apartment buildings it had acquired in Manchester Square and Belford. In 2007, it announced in a newsletter that "the accelerated pace of demolitions in Manchester Square and Airport Belford" was " 'continu[ing]' " and that by midsummer, 150 apartment buildings would have been " 'cleared.' " The newsletter forecast that " 'by the end of 2008[,] all vacant structures owned by the Airport will have been demolished.' "[4] By August 2008, 50 percent of the structures acquired by the City in the two areas had been demolished.

In March 2009, the City circulated a flyer "displayed and available [to residents] from boxes at strategic locations in [Manchester Square and Belford]." It was entitled "Your Demolition Questions Answered," and stated: "The Airport has a policy of demolishing all properties it purchases as a means of improving safety and security in Airport Belford and Manchester

---

[3] The statement of facts did not specify the nature of this program or when it began. According to LAWA resolution No. 23654 dated October 20, 2008 (attached to the moving papers as exhibit 9), on August 17, 1999, by resolution No. 20764, the Board of Airport Commissioners authorized the executive director to extend purchase offers to Manchester Square and Belford property owners "who qualified for advanced acquisition based on hardship, in accordance with applicable Federal and State laws as part of the noise mitigation Voluntary Residential Acquisition and Relocation Program ('Program') at [LAX]." Resolution No. 23654 further explained that "the Program is designed to respond to all owners who voluntarily request [LAWA] to acquire their residential properties (single- and multi-family) and to provide relocation assistance services to both owners and tenants."

The staff report that accompanied resolution No. 23654 (also attached to the moving papers) explained that on July 18, 2000, the Voluntary Residential Acquisition and Relocation Program (Program) was approved by the Board of Airport Commissioners by resolution No. 21093. Resolution No. 21093 "authorized the Executive Director to open the Program to all property owners in the Manchester Square and Airport/Belford areas east of LAX."

The statement of facts obliquely referred to the Program in fact No. 22, which stated that the deputy executive director of LAX testified that after only five buildings were soundproofed under a predecessor program, "the so-called 'voluntary' soundproofing program became a program where soundproofing was not an option. . . . The [only] option LAWA offered was 'voluntary' acquisition."

[4] The newsletter also stated: "It is important to note that the residential acquisition program is a voluntary program. This means that the owner of your building is under no obligation to sell to the Airport. Only tenants in airport-owned buildings are eligible for relocation benefits."

Square. The demolition of all Airport-owned vacant structures will be completed by May, weather permitting. As the Airport acquires additional properties, these structures will be grouped together and demolished in phases."[5]

Real parties in interest sought to establish that the City's conduct "was deliberately intended and designed to result in blight, to encourage flight from these neighborhoods, and to reduce property values in the area so that the Airport could acquire the remaining parcels (including [real parties in interest's] lands) more cheaply," "imposed a direct and special interference on [their] propert[ies]," and "effectively froze the market for property in Manchester Square and Belford." The evidence to support that the City deliberately intended to blight the areas consisted in part of the deposition of airport acquisition program manager, Lourdes Romero, who had said that the airport had allowed the employees of its outside management company to live in some of the buildings it acquired. Real parties in interest contended this meant that "[t]he [City] did not have to vacate the buildings it acquired. It could have left the residents in place until its own plans were firmed up." The statement of facts asserted that the City "could end the blight by simply restoring these neighborhoods to use" and that it could "rent the buildings it is now demolishing or it could develop uses on the demolished and vacated properties rather than leaving them vacant." Real parties in interest also presented evidence that prior to demolition, some of the structures on the acquired properties were used for police or fire training, that the City allowed film crews to use some vacated buildings to stage explosions and fires, and that the City did not always keep the vacated properties free from trash and debris or provide adequate landscape maintenance.

To support "direct and special interference with their properties," real party in interest Peter Plotkin prepared graphs showing that vacancies in the apartment buildings owned by real parties in interest had gone from approximately 3 percent in June 2006 to close to 18 percent in May 2009. He stated that the vacancy rates "began to spike concurrently with LAWA's intensified activity [in 2007]" and that "[t]he spike in vacancy rates preceded the real estate recession which began in late 2008." Plotkin further stated: "This is not the neighborhood that existed when I purchased the subject properties and built apartments on them during the 1960's through the 1980's. Anyone visiting Manchester Square now would see that the Airport has acquired huge swaths of properties and demolished the buildings on them. Anyone visiting Manchester Square now would also see that the activity is ongoing and that

---

[5] The flyer also stated: "Each month we receive a number of calls from tenants in buildings LAWA does not own. We are most frequently asked questions about the acquisition of properties. It is important to understand that the Program is a voluntary acquisition program. It is not mandatory for owners to sell their property to the Airport. As such, relocation benefits are for eligible tenants in LAWA-owned buildings, only." (Italics omitted.)

there is more to come." The statement of facts also cited the staff report prepared in conjunction with resolution No. 23654, which had stated that "the subject neighborhoods 'have been significantly changed by' [the Program]" due to the acquisitions and demolitions.

With respect to the inability to sell their property to third parties, the statement of facts conceded that real parties in interest had not attempted to sell to outside buyers, but asserted without citation to evidence that "other buyers, knowing all of the facts (i.e. that LAWA had already bought up most of the property, and that the neighborhoods would be progressively blighted and abandoned) would take their business elsewhere." The statement of facts quoted the staff report prepared in conjunction with resolution No. 23654 to the effect that deferring purchase of the property at issue or discontinuing the Program could "[n]egatively affect the owner's ability to sell at this time" and "[r]esult in inverse condemnation claims."[6]

In the statement of facts, real parties in interest asserted that "LAWA *claims* to have no plan to develop or use the properties at this time." (Italics added.) Real parties in interest did not, however, attempt to establish that this claim was false. To the contrary, the statement of facts repeatedly stressed that there was "no plan" for the properties the City acquired in Manchester Square and Belford, other than to eventually acquire all the properties in those two areas through the voluntary acquisition program and to demolish the structures. The statement of facts specifically quoted from the staff report prepared in conjunction with resolution No. 23654, stating that there was no " 'specific plan for development [of the property within the Program area]' " and that as of the time of the adoption of resolution No. 23654 (Oct. 2008), " 'LAWA is not requesting authorization to redevelop or reuse the property.' "[7]

### 2. *Opposition*

The City did not dispute most of the facts set forth in real parties in interest moving papers. It acknowledged that it had purchased most of the single-family homes and multi-family dwellings in the Manchester Square and Belford areas, and that it had or was in the process of demolishing the structures on the properties it had purchased. The City took the position that neither its purchase and demolition activities nor its occasional practice of

---

[6] The staff report also stated that deferral of acquisition could "[c]ause owner to opt out of selling at this time, which could significantly drive up later acquisition and relocation costs."

[7] The staff report went on to say: "Any future redevelopment or reuse of property in the Manchester Square or Airport/Belford Program areas will require subsequent study and approval by the City Planning Department, [the Board of Airport Commissioners], and [the City]."

allowing fire department practice and film shoots in abandoned buildings nor its failure to keep every lot watered and weed free supported real parties in interest's inverse condemnation claim.

The City also put forth new facts in its counterstatement. It established that in 1997, it had begun implementing a "Residential Soundproofing Program" in order to sound insulate residential dwellings near LAX. It learned, however, that the majority of homeowners and residents of Manchester Square and Belford were not interested in soundproofing. A group of residents, supported by political leaders who represented the area, requested that the City purchase the properties in the area in lieu of soundproofing and presented survey evidence that the vast majority of residents of the area expressed a desire for buyout and relocation. This caused the City to develop the Program, which was approved by the Board of Airport Commissioners in July 2000. The Program was voluntary—"[i]f an owner did not voluntarily indicate an interest in having his property purchased, the Airport would not seek to purchase that owner's property." The Program required demolition of acquired properties because its objective was to mitigate incompatible residential land uses affected by noise from airport operations.

The Program contemplated no specific uses for the properties. After acquisition, relocation of residents and demolition of existing structures, "the parcel would be landscaped and maintained in an undeveloped state." The City conceded that in 2000, the Department of Airports had prepared and reviewed different alternatives for a master plan for LAX, one of which involved Manchester Square. However, in 2004, the city council approved a master plan that did not include Manchester Square.

### C.   Court's Order

The court ruled in favor of real parties in interest, finding that real parties in interest had established that the City's creation of " 'condemnation blight' " resulted in "a constitutional duty to pay just compensation to [real parties in interest]." It concluded that although there had been "no formal initiation of condemnation proceedings," it was undisputed that the City "actually acquired the great bulk of buildings in the two subject neighborhoods, relocated those buildings' tenants, and demolished the buildings acquired," and that it spent over $225 million to acquire property in Manchester Square and over $40 million to acquire property in Belford. The court relied in part on the October 2008 staff report prepared in conjunction with resolution No. 23654, which discussed the number of properties acquired and said that "[d]iscontinuing acquisition . . . could potentially expose LAWA to inverse condemnation litigation." The court concluded that under the California Constitution and applicable law, "[i]nverse condemnation

occurs when a gov[ernmental] agency depresses land values in an area near where it wants to acquire before even making its decision to take a particular parcel located in that area. Such will trigger the duty to pay just compensation. No actual taking is required."

## DISCUSSION

### A. General Principles Governing Inverse Condemnation

■ Real parties in interest's sole claim against the City was for inverse condemnation. Inverse condemnation, like eminent domain, "rest[s] on the constitutional requirement that the government must provide just compensation to a property owner when it takes his or her private property for a public use." (*Beaty v. Imperial Irrigation Dist.* (1986) 186 Cal.App.3d 897, 902 [231 Cal.Rptr. 128] (*Beaty*).) Under the California Constitution, "[p]rivate property may be taken or damaged for a public use and only when just compensation . . . has first been paid to, or into court for, the owner." (Cal. Const., art. I, § 19.) As explained in *Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368 [41 Cal.Rptr.2d 658, 895 P.2d 900], the phrase " 'or damaged' " was added in 1879 to "expand the circumstances in which a private property owner may recover when the state takes property for a public use, or when the state's construction of a public work causes damage to adjacent or nearby property" and to "clarify that the government was obligated to pay just compensation for property damaged in connection with the construction of public improvements, even if the government had not physically invaded the damaged property." (10 Cal.4th at pp. 378–379.)

■ An inverse condemnation proceeding—an action in which "the property owner takes the initiative"—is similar to a direct condemnation or an eminent domain proceeding—an action in which "the public entity takes the initiative . . . ." (*Beaty, supra*, 186 Cal.App.3d at p. 902.) There are, however, significant differences. "While, in eminent domain litigation, the focus is usually limited to the amount of compensation owed the property owner under the 'just compensation' clause, in an inverse condemnation action, the property owner must first clear the hurdle of establishing the public entity has, in fact, taken his or her property before he or she can reach the issue of 'just compensation.' " (*Id.* at p. 903.) "Further, while an eminent domain proceeding contemplates a permanent acquisition of private property for a public use, an inverse condemnation action may be maintained for mere damage to property [citation], for temporary invasions [citation] and even when the public entity does not physically possess the property [citations]. Unlike an eminent domain proceeding, an inverse condemnation action does not always result in the public entity acquiring private property." (*Id.* at p. 904.)

■ "To state a cause of action for inverse condemnation, the property owner must show there was an invasion or appropriation (a 'taking' or 'damaging') of some valuable property right which the property owner possesses by a public entity and the invasion or appropriation directly and specially affected the property owner to his injury." (*Beaty, supra,* 186 Cal.App.3d at p. 903.) The damage must result from " ' " 'an exercise of governmental power while seeking to promote "the general interest in its relation to any legitimate object of the government." ' " ' " (*Id.* at p. 904, quoting *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 867 [218 Cal.Rptr. 293, 705 P.2d 866].) In other words, in inverse condemnation, the government is obligated to pay for property taken or damaged for " 'public use' " or damaged in the construction of "public improvements." (*Customer Co. v. City of Sacramento, supra,* 10 Cal.4th at pp. 379–380.) A " 'public use' " is " ' "a use which concerns the whole community as distinguished from a particular individual or a particular number of individuals; public usefulness, utility or advantage; or what is productive of general benefit; a use by or for the government, the general public or some portion of it." ' " (*Id.* at p. 381, quoting *Miller v. City of Palo Alto* (1929) 208 Cal. 74, 77 [280 P. 108].)

■ A party who does nothing more than establish property damage as the result of negligent conduct of public employees or a public entity has not established a right to recover under a claim of inverse condemnation. (*Customer Co. v. City of Sacramento, supra,* 10 Cal.4th at p. 381.) Nor have courts recognized a general right to recover in inverse condemnation for a decline in the value of property adjacent to a public project, which property is not itself slated for condemnation. Thus, in *Hecton v. People ex rel. Dept. of Transportation* (1976) 58 Cal.App.3d 653, 656–657 [130 Cal.Rptr. 230], the court declined to recognize a claim for inverse condemnation where the owners of a large shopping center claimed a public entity's acquisition of hundreds of residences adjacent to the property had deprived the shopping center of exposure to the adjacent land and its residences, thus resulting in a loss of revenue and diminution of the value of the property. (*Id.* at p. 657.) The court found no authority for the proposition "that plaintiffs have a right to continued availability of a particular clientele that has patronized in the past the particular commercial ventures developed by plaintiffs on their property." (*Ibid.*) Similarly, in *Bacich v. Board of Control* (1943) 23 Cal.2d 343 [144 P.2d 818], the Supreme Court held that an owner of a home left isolated by the condemnation of surrounding residences and the erection of an elevated highway could not recover in inverse condemnation for the diminution in his property's value resulting from the isolation of his residence: "There is no property right appurtenant to plaintiff's property . . . which entitles him to the maintenance of the residences . . . ." (*Id.* at pp. 355–356.) Finally, in *Oliver v. AT&T Wireless Services* (1999) 76

Cal.App.4th 521 [90 Cal.Rptr.2d 491], the court rejected the contention that visual blight alone could form the basis for a claim of inverse condemnation. Noting that such a claim "requires more than a showing that the value of the property has diminished as a result of the project," the court held that "[t]he mere *appearance* of a lawful structure on neighboring property cannot give rise to an action in inverse condemnation . . . unless we are to do violence to the words 'taken or damaged' in the constitutional provision upon which such claims are founded." (*Id.* at pp. 529, 532.)

## B. *Establishing Claim for Unreasonable or Oppressive Precondemnation Conduct*

It has long been established that acts by a public authority constituting a "physical invasion" or "direct legal restraint on the use of . . . property" could amount to a " 'de facto taking' of the property" for purposes of an inverse condemnation claim, even where the entity does not formally condemn or intend to condemn. (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1547 [49 Cal.Rptr.3d 259]; see, e.g., *Reardon v. San Francisco* (1885) 66 Cal. 492, 500 [6 P. 317] [compensable taking resulted when construction of sewer caused compaction of soil and damage to structures on plaintiffs' adjacent property]; *House v. L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 390–392 [153 P.2d 950] [taking occurred when levees installed by flood control district caused flooding on adjacent land]; *Heimann v. City of Los Angeles* (1947) 30 Cal.2d 746, 754–758 [185 P.2d 597], overruled in part on other grounds in *County of Los Angeles v. Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680] [where contractor piled earth, rock, and other materials and erected sheds and other temporary structures on plaintiffs' uncondemned property during construction of public improvement on adjacent land, matter remanded for plaintiffs to establish entitlement to damages for temporary taking]; *Bauer v. County of Ventura* (1955) 45 Cal.2d 276, 282–283 [289 P.2d 1] [county damaged land within meaning of taking clause where its construction of ditches, banks and levees caused water to overflow onto plaintiff's property]; *Sneed v. County of Riverside* (1963) 218 Cal.App.2d 205, 207, 209 [32 Cal.Rptr. 318] [owner stated claim for inverse condemnation where ordinance established extremely restrictive height standards and limits for his airport-adjacent property]; *Peacock v. County of Sacramento* (1969) 271 Cal.App.2d 845 [77 Cal.Rptr. 391] [ordinance prohibiting growing vegetation or erecting structures on plaintiff's property in order to keep airspace clear for nearby airport deprived plaintiff of beneficial use of his property and amounted to compensable taking].) Recovery under inverse condemnation is similarly allowed where the public entity impairs a property owner's ability to access his property. (See, e.g., *Eachus v. Los Angeles etc. Ry. Co.* (1894) 103 Cal. 614, 615–617 [37 P. 750] [construction of railroad along street in front of plaintiffs' home lowered the grade of the street and cut off plaintiffs' access]; *McCandless v. City of Los Angeles* (1931)

214 Cal. 67, 71 [4 P.2d 139] [owner of property abutting street "possesses not only the right to the use of the street in common with all other members of the public but also a private right or easement for the purposes of ingress and egress to and from her lot which right may not be taken away or destroyed or substantially impaired or interfered with for public purposes without just compensation therefor"].)

In *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345] (*Klopping*), the Supreme Court concluded that conduct falling short of physical invasion, legal restraint on the use of the property, or obstruction of access could also lead to a viable claim for inverse condemnation. In *Klopping*, the city had initiated and subsequently withdrawn condemnation proceedings while, at the same time, stating its firm intention to acquire the plaintiffs' properties in the future. The plaintiffs brought suit for inverse condemnation, contending that because of the "condemnation cloud hovering over their lands, they were unable to fully use their properties and that this damage, reflected in loss of rental income, should be recoverable." (*Id.* at p. 46.) The court was principally concerned with ensuring that in determining fair market value, the trier of fact consider neither an increase nor a decrease in land value caused by precondemnation publicity. The court was also aware that "[t]o allow recovery in every instance in which a public authority announces its intention to condemn some unspecified portion of a larger area in which an individual's land is located would be to severely hamper long-range planning by such authorities . . ." and "might deter public agencies from announcing sufficiently in advance their intention to condemn" in abrogation of the public interest. (*Id.* at pp. 45, fn. 1, 51.) At the same time, "it would be manifestly unfair and violate the constitutional requirement of just compensation to allow a condemning agency to depress land values in a general geographical area prior to making its decision to take a particular parcel located in that area." (*Id.* at p. 45, fn. 1.) The court balanced these competing interests by holding that the owner should be compensated for a taking "when the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct." (*Id.* at pp. 51–52.) It followed that "a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Id.* at p. 52.) The rule

applied "even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property . . . ." (*Ibid.*)[8]

A year after issuing the opinion in *Klopping*, the Supreme Court clarified its limits in *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111] (*Selby*). In *Selby*, after the city and county had adopted a general plan indicating the general location of proposed streets, an owner of property depicted as the location through which some of the proposed streets would run brought an action seeking a declaration that there had been a taking under *Klopping*. (*Selby, supra*, at pp. 118–119.) The court disagreed, holding that "[t]he adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property" because such plans are "subject to alteration, modification or ultimate abandonment, so that there is no assurance that any public use will eventually be made of [the specified] property." (*Id.* at pp. 119, 120.) The court explained that the holding in *Klopping* applied only where the public entity had "acted unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain proceedings or by other oppressive conduct." (*Selby*, at p. 119.)

Following *Klopping* and *Selby*, numerous courts have held that a property owner may recover damages under an inverse condemnation theory where the public entity indicates a firm intention to acquire his or her property and either unreasonably delays prosecuting condemnation proceedings or commences and abandons such proceedings.[9] (See, e.g., *Tilem v. City of Los Angeles* (1983) 142 Cal.App.3d 694, 698–699, 708 [191 Cal.Rptr. 229]

---

[8] The plaintiffs in *Klopping* alleged and sought to prove that the city's actions were "unreasonabl[e]," "performed for the purpose of depressing the fair market value [of their properties] and preventing plaintiffs from using their land," and led to a loss of rental income. (*Klopping, supra*, 8 Cal.3d at pp. 53, 54.) The court held that these contentions were sufficient to survive a demurrer. However, as to one of the claimants, the city had initiated a direct condemnation action while the appeal was pending and its action had proceeded to judgment. The court concluded that as to that claimant, "[s]ince [he] could have claimed his loss of rental income, if any, occasioned by the two precondemnation announcements in the eminent domain suit, he is barred from seeking those damages in inverse condemnation once the condemnation proceeding becomes final." (*Id.* at p. 58.) The other claimant had lost his property through foreclosure, and contended that the cloud of condemnation had prevented him from deriving the income from the property needed to make the mortgage payment. (*Ibid.*) The court concluded that "this fortuity [(the loss of the subject property)] does not preclude him from recovering for any damages caused by the city in making the two announcements [(concerning condemnation)] in question" and remanded for his claim to be "more fully explored." (*Ibid.*)

[9] Real parties in interest refer to a *Klopping*-style inverse condemnation claim as a claim for "condemnation blight." That term is rarely used in California, where claims of the type asserted in *Klopping* are usually referred to as claims for unreasonable precondemnation delay or unreasonable precondemnation conduct (or "action" or "activities"). (See, e.g., *HFH, Ltd. v. Superior Court* (1975) 15 Cal.3d 508, 517, fn. 14 [125 Cal.Rptr. 365, 542 P.2d 237];

[city " 'took' . . . [plaintiff's] ability to use his land for a substantial period of time" where it announced a plan to widen road through his property and commenced and abandoned condemnation proceedings]; *Taper v. City of Long Beach, supra,* 129 Cal.App.3d at pp. 602, 615 [plaintiffs entitled to precondemnation damages where their beach property was rendered "unsaleable and unusable" due to "widely and publicly disseminated pre-condemnation announcements" and other activities indicating the city intended and desired to acquire the property, such as having the property appraised, applying for a grant to use toward acquisition, and informing plaintiffs' counsel that it would not permit plaintiffs to develop the property]; *People ex rel. Dept. Pub. Wks. v. Peninsula Enterprises, Inc., supra,* 91 Cal.App.3d at pp. 341–343, 356 [precondemnation damages awardable where two years prior to initiating condemnation action, entity approached owners regarding possible acquisition of their property, informed owners that acquisition would take place within a year, provided owners a map depicting the property affected, and made an offer of purchase].)

■ As *Klopping* made clear, to assert a claim for inverse condemnation under its rationale, the plaintiff must establish first, that the public entity engaged in unreasonable activity, either by excessively delaying initiation of an eminent domain action or by other oppressive conduct; and second, that the offensive conduct was a precursor to the entity's condemnation of the plaintiff's property for a public purpose. (See *Klopping, supra,* 8 Cal.3d at p. 52, italics added ["condemnee must be provided with an opportunity to demonstrate that . . . the public authority acted improperly either by unreasonably delaying eminent domain action *following an announcement of intent to condemn* or by other unreasonable conduct *prior to condemnation*"]; *Selby, supra,* 10 Cal.3d at p. 119.) This was confirmed in *HFH, Ltd. v. Superior Court, supra,* 15 Cal.3d 508, where the court found no basis for a *Klopping*-style inverse condemnation recovery after the city designated the bulk of the plaintiff's land for low-density residential use, but evinced no desire to condemn the land or acquire it for a public purpose. (15 Cal.3d at p. 512.) Describing *Klopping* as addressing inequitable actions undertaken by a public entity "as a prelude to public acquisition," the court explained that in *Klopping,* "the city in question made public announcements that it intended to acquire the plaintiff's land, then unreasonably delayed commencement of eminent domain proceedings, with the predictable result that the property became commercially useless and suffered a decline in market value. We held only that the plaintiff should be able to include in his eminent domain

---

*Guinnane v. City and County of San Francisco* (1987) 197 Cal.App.3d 862, 866 [241 Cal.Rptr. 787]; *Taper v. City of Long Beach* (1982) 129 Cal.App.3d 590, 604 [181 Cal.Rptr. 169]; *People ex rel. Dept. Wks. v. Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332, 355 [153 Cal.Rptr. 895].)

damages the decline in value attributable to this unreasonable precondemnation action by the city. *The case thus in no way resembles the instant one, in which plaintiffs make no allegations that the city intends to condemn the tract in question.*" (*HFH, Ltd. v. Superior Court, supra*, 15 Cal.3d at pp. 516–517, fn. 14, italics added & omitted; accord, *Guinnane v. City and County of San Francisco, supra*, 197 Cal.App.3d at p. 866 [where plaintiff contended that city's delay in acting on his application for a building permit constituted "unreasonable precondemnation activities," court noted that the plaintiff "overlooks a fundamental distinction between this case and *Klopping*: unlike *Klopping*, there was never any announcement by the city of an intention to condemn plaintiff's property"]; *Hecton v. People ex rel. Dept. of Transportation, supra*, 58 Cal.App.3d at p. 658 [*Klopping* "offer[ed] no comfort to plaintiffs' cause" where plaintiffs' property lost value and their business lost revenue but they were "not subject to condemnation proceedings, delayed or timely"; "*Klopping* does not stand for the proposition that any rental loss occasioned by conduct of a public entity constitutes a compensable taking."].)

■ In short, a claim for precondemnation damages under *Klopping* "is not akin to a court-created private right of action enabling property owners to collect damages whenever a [public entity] acts 'unreasonably.' " (*Redevelopment Agency of San Diego v. Mesdaq* (2007) 154 Cal.App.4th 1111, 1135 [65 Cal.Rptr.3d 372].) Rather, there must be a finding of "unreasonable precondemnation activity . . . before liability can be imposed on the basis of *Klopping*." (*Briggs v. State of California ex rel. Dept. Parks & Recreation* (1979) 98 Cal.App.3d 190, 206 [159 Cal.Rptr. 390].)

### C. *Real Parties in Interest Failed to Present Facts Necessary to Establishing a* Klopping-*Style Claim for Precondemnation Damages*

In view of the foregoing, the deficiencies in real parties in interest's motion for summary adjudication are obvious. First and foremost, real parties in interest failed to present evidence to establish the most basic component of a *Klopping* inverse condemnation claim—that the City had condemned their properties, had an intent to eventually acquire their properties through condemnation, or had a plan for future use of their properties that would someday require condemnation of their properties—or any properties in Manchester Square or Belford.[10] To the contrary, the evidence presented

---

[10] In view of the decision in *Selby, supra*, 10 Cal.3d 110, that mere general planning cannot support a claim for inverse condemnation, courts have debated whether a *Klopping*-style inverse condemnation claim can exist where the public entity has not yet adopted a formal condemnation resolution covering the claimant's land. (Compare *People ex rel. Dept. Pub. Wks. v. Peninsula Enterprises, Inc., supra*, 91 Cal.App.3d at p. 356 [where entity approached owners

indicated that (1) for roughly a decade, the City had entered into voluntary agreements with owners to purchase the properties located in Manchester Square and Belford and (2) the City had "no plan" for the properties it had so acquired.

Real parties in interest contend in their opposition and contended in their memoranda below that the program is not truly voluntary and that City "coerced" owners into selling by blighting the area around them through demolition of structures and allowing fire department practice and film shoots in some of the vacant buildings. However, real parties in interest presented no evidence that any former owner felt coerced to sell or that the City engaged in the alleged actions for the purpose of reducing the value of property in the area and thereafter took advantage of property owners in negotiating the purchase price. (See *Toso v. City of Santa Barbara* (1980) 101 Cal.App.3d 934, 952, 955–956 [162 Cal.Rptr. 210] [precondemnation activities not so unreasonable as to warrant damages in inverse condemnation where plaintiff failed to establish that city engaged in such activities "to freeze or lower the value of the land in order to buy it at a cheaper price"].) Indeed, real parties in interest presented no evidence concerning their negotiations with the City or the value of properties before or after the City's activities in the subject areas, and admitted they had made no attempt to sell their properties or determine their fair market value. In contrast, the City presented evidence that the program was entirely voluntary and that prior to institution of the acquisition program, the vast majority of homeowners in the area expressed a willingness to take advantage of a program under which they would obtain not only appraised value for their property but also an allowance for the cost of relocation.

Moreover, even had real parties in interest established that the purchase agreements were somehow involuntary, they failed to establish that the land

---

regarding purchase of their property, informed owners that acquisition would take place within a year and provided a map depicting the property affected, court concluded that "the type of direct and special interference required for precondemnation damages can occur even in the absence of a formal resolution of condemnation"] with *Contra Costa Water Dist. v. Vaquero Farms, Inc.* (1997) 58 Cal.App.4th 883, 899 [68 Cal.Rptr.2d 272] [noting that the decision in *Peninsula Enterprises* "risks either inhibiting legitimate preacquisition activities or promoting ill-advised precipitous condemnation action by officials concerned about exposure to additional claims of compensation"].) Here, however, real parties in interest did not attempt to establish that the City had engaged in even preliminary or general planning of a project that would require condemnation of their property or any other property in the subject areas. Accordingly, we need not resolve whether a formal condemnation resolution is necessary to state a *Klopping*-style claim.

was being acquired for a public purpose.[11] (See *Customer Co. v. City of Sacramento, supra,* 10 Cal.4th at pp. 378–383 [damage to property that "bears no relation to a 'public improvement' or 'public work' of any kind" not compensable under taking clause]; *City of Stockton v. Marina Towers LLC* (2009) 171 Cal.App.4th 93, 104 [88 Cal.Rptr.3d 909] ["It is a cardinal principle of statutory and constitutional law that private property may only be taken for a public use." (italics omitted)].) A public use is one " ' "which concerns the whole community as distinguished from a particular individual or a particular number of individuals." ' " (*Customer Co. v. City of Sacramento, supra,* at p. 381.) According to the undisputed evidence presented, once the properties were acquired, structures were demolished and the land was left empty except for minimal landscaping. Real parties in interest sought to establish that the purpose of all this activity was to reduce property values on land LAX would need in the future so that it could acquire the remaining parcels more cheaply. However, the City disputed this and presented evidence that the only purpose of the program was to assist residents affected by noise from airport operations.

■ Finally, with respect to the alleged "unreasonableness" of the City's conduct, real parties in interest suggested that the City could have prevented the "blight" by "restoring [the] neighborhoods to use," "rent[ing] the buildings it is now demolishing," or "develop[ing] uses on the demolished and vacated properties rather than leaving them vacant." The purpose of the acquisition program was to protect individuals from living in proximity to airport noise. Having expended considerable sums to purchase residences and relocate occupants from homes and apartment buildings disproportionately affected by airport noise, it is difficult to fathom why the City would spend additional sums to replace those relocated with new residents. In short, to support their *Klopping* inverse condemnation claim, real parties in interest were required to show (1) that the City intended to acquire their property for a public purpose through condemnation at some future point; and (2) that the City engaged in unreasonable actions geared toward devaluing their property so that the City could acquire it at a discounted price. Their motion for summary adjudication fell short on both counts.

### D. *Statute of Limitations*

The trial court, having found that the City's conduct in acquiring properties in Manchester Square and Belford through voluntary purchase and vacating

---

[11] Real parties in interest not only failed to present evidence that the land was being held for purposes of a public use, such as airport expansion, but affirmatively set forth in their statement of facts that the City had "no plan" for the properties other than to leave them vacant.

and demolishing the structures on them constituted unreasonable precondemnation conduct sufficient to support real parties in interest's inverse condemnation claim, concluded that the applicable three-year statute of limitations had not run because the situation involved " 'continuous and repeated damage incident to a public improvement.' " (Quoting *Lee v. Los Angeles County Metropolitan Transportation Authority* (2003) 107 Cal.App.4th 848, 857 [132 Cal.Rptr.2d 444].) As we have concluded that these activities alone cannot support the inverse condemnation claim, we need not resolve the statute of limitations issue.

## DISPOSITION

The petition for writ of mandamus is granted. Let a peremptory writ of mandate issue directing respondent superior court to vacate its order of May 24, 2010, granting real parties in interest's motion for summary adjudication and issue a new order denying the motion. Petitioner is awarded its costs on appeal.

Epstein, P. J., and Suzukawa, J., concurred.